TIMBERWALK APARTMENTS, PART-
NERS, INC., Timberwalk Apartments
Ltd., and Sovereign National Manage-
ment, Inc. d/b/a Sovereign/LBI, Petition-
ers,

v.

Tammie Rene CAIN a/k/a Tammy
Cain, Respondent.

No. 97–0475.

Supreme Court of Texas.

Argued Jan. 7, 1998.

Decided July 3, 1998.

Wayne Adams, Diane M. Guariglia, Jack McKinley, Houston, for petitioners.

Thomas M. Stanley, Morris Tabak, Houston, for respondent.

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, GONZALEZ, ENOCH, OWEN, BAKER, ABBOTT and HANKINSON, Justices, joined.

Plaintiff alleges she was raped in her apartment because her landlord failed to provide adequate security. The principal issues are whether plaintiff alleges a negligent activity or a premises defect, whether chapter 92, subchapter B of the Property Code applies to personal injury actions, and whether the risk that a tenant would be sexually assaulted was reasonably foreseeable to defendants. The district court rendered judgment on a verdict for defendants, and the court of appeals reversed.[1] We reverse in part and affirm in part the judgment of the court of appeals and remand the case to the district court for further proceedings.

## I

Tammy Rene Cain was raped in the bedroom of her Houston apartment by an intruder, Peter Saenz, about 3:00 a.m. one Sunday. Saenz was ultimately convicted of that sexual assault and seven others that followed, and sentenced to prison. Cain brought suit for her personal injuries against the owners of the 300–apartment complex, Timberwalk Apartments, Partners, Inc. and Timberwalk Apartments Limited (together, "Timberwalk"), and their management company, Sovereign National Management, Inc., alleging that they negligently failed to provide adequate security, including "charley" bars or pin locks for sliding glass doors, alarm systems in the apartments, access gates to the complex, proper lighting, routine surveillance, and guards. Cain also alleged violations of the Deceptive Trade Practices–Consumer Protection Act.[2] Cain claimed actual and punitive damages.

Many issues at trial were sharply disputed. Saenz told police that he met Cain previously in the parking lot, but Cain stated that she did not remember the encounter. Saenz also told police that Cain admitted him through the front door to use the telephone, but Cain denied this. She and the investigating officer testified that Saenz entered through the sliding glass door, as evidenced by his palm prints on that door. Cain testified that the sliding glass door was locked, but there was no sign of forced entry. Cain's expert testified that the sliding glass door could be opened while locked, but he and others tried to do it without success. Cain had a broomstick that she sometimes, but not always, used as a "charley" bar, and it is not clear whether she used it the night of the assault. Cain's apartment had an alarm system, but it was not operating at the time. Cain's roommate believed that defendants charged an additional fee to operate the alarm, but defendants asserted that Cain and her roommate could have had an operating code for the asking. Cain contends defendants never told her or her roommate this. Cain claimed that there should have been security guards watching the apartments, but defendants asserted that they told Cain's roommate that the only guard was an officer who lived in one of the apartments. An access gate on the side of the complex where Cain lived did not work, and Cain understood that it would be fixed, but defendants asserted that Cain's understanding was based on representations of the prior owner of the complex and that they never promised to fix the gate. Cain's roommate complained when the gate remained broken and asked to move to the other side of the complex where the access gate worked but was told that there was a six-month waiting list for those units. There was evidence that Saenz was living at the time with his common law wife in the same apartment complex, so that he would have been entitled to access whether the gate worked or not. However, there was also evidence that Saenz was still living with a girl friend elsewhere.

1. 942 S.W.2d 697.

2. Tex. Bus. & Com.Code §§ 17.41–.63.

One of the few issues on which the evidence was essentially undisputed was the incidence of criminal activity at the Timberwalk Apartments, at nearby complexes, and in the surrounding area. Cain admitted that she had not heard of any criminal activity at the Timberwalk Apartments during the six months she had stayed there, except when her roommate's ex-boyfriend slashed the tires on her roommate's car. Sovereign's manager of the complex for over a decade testified that she had never heard of another sexual assault at the complex. In fact, the only serious crimes ever reported from the Timberwalk Apartments were the burglary of one car and the theft of another. During the year preceding the assault on Cain, police had received eleven calls from within a one-mile radius of Timberwalk reporting sexual assaults. Four of these calls originated in apartment complexes, one of which bordered Timberwalk. But these were only calls, not actual crimes. Incident reports showed that only one of the eleven callers reported an actual crime, and it did not involve rape. The year preceding the assault on Cain, statistics showed that sexual assault occurred in Houston 0.72 times per 1,000 people. The year before that, the rate of occurrence in Timberwalk's census tract was 0.58 sexual assaults per 1,000 people, while the statewide rate was only slightly lower, 0.534 per 1,000 people. The total of all assault-type crimes in all apartment complexes in the Timberwalk area the year preceding Cain's sexual assault was six, a figure defendants' expert characterized as "astonishingly low".

The jury found that Cain's injuries were caused only by her own negligence, and failed to find that defendants violated the DTPA. The district court rendered judgment on the verdict for defendants, and Cain appealed, but only on her negligence claim and not her DTPA claim.

The court of appeals reversed and remanded for a new trial, holding that the district court erred in defining negligence with respect to defendants as in a premises liability case, viz, the "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier knows about or in the exercise of ordinary care should know about."[3] The court concluded that this instruction "probably kept the jury from considering the gravamen of Cain's complaint, that the apartment complex had a duty to, but did not, provide adequate security measures to protect its tenants."[4] Cain argued that the jury should have been instructed that negligence with respect to defendants means "failure to use ordinary care; that is to say, failure to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances."[5]

The appeals court also held that the jury should not have been charged as follows:

You are instructed that a landlord shall make a diligent effort to repair or remedy a condition if the tenant specifies the condition in a notice to the person to whom or to the place where rent is normally paid and the condition materially affects the physical health or safety of an ordinary tenant. The tenant's notice must be in writing only if the tenant's lease is in writing and requires written notice.[6]

The court concluded that this instruction "limited the landlord's duty to the duty to repair a condition and did not include the duty to take precautions to prevent foreseeable criminal acts of a third party."[7] The court of appeals remanded the case for a new trial without reaching Cain's third complaint, that the district court erred in not declaring a mistrial or granting a new trial after Timberwalk's counsel violated an order on motion in limine by referring to another lawsuit Cain had filed.[8]

**3.** 942 S.W.2d 697, 701–702.

**4.** *Id.* at 702.

**5.** *Id.* at 702 n. 1.

**6.** *Id.* at 703.

**7.** *Id.*

**8.** *Id.*

Timberwalk and Sovereign filed separate petitions for writ of error in this Court. We granted both.[9] Both argue that there was no error in the jury charge. If they are correct, then Sovereign is entitled to rendition of judgment, but Timberwalk is entitled only to a remand to the court of appeals for consideration of Cain's additional complaint not previously addressed. However, Timberwalk also argues that as a matter of law it owed Cain no duty of care because Saenz's criminal attack on her was unforeseeable. If this argument is correct, then Timberwalk, too, is entitled to rendition of judgment. Therefore, we must consider both the charge arguments and the duty argument. We consider the charge arguments first.

## II

### A

■ Defendants contend that the district court did not err in charging the jury as on a premises liability claim rather than a negligent activity claim. We agree. In *Keetch v. Kroger Co.*,[10] we explained the difference between liability for negligent activity and liability for failing to remedy an unreasonable risk of harm due to the condition of premises. "Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity."[11] Negligence in the former context means simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done.[12] Negligence in the latter context means "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about."[13] This is the instruc-

tion the district court gave in the present case.

A complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises liability claim.[14] That is true of the present case. Cain does not assert that she was injured by or as a contemporaneous result of any activity of defendants. The only activity that injured Cain was Saenz's. Rather, Cain asserts that defendants' failure to provide adequate security measures created an unreasonable risk of harm that defendants knew or should have known about and yet failed to correct. This is a premises liability claim on which the district court correctly charged the jury. The court properly refused Cain's request to charge the jury as in a negligent activity case.

### B

■ Defendants also argue that the district court did not err in charging the jury concerning their responsibility to repair or remedy conditions of which tenants make written complaint. The instruction was taken verbatim from Section 92.052(a)(1), (a)(3), and (d) of the Texas Property Code. Cain argues that the district court erred in giving the instruction because Section 92.052 has no application in this case, the instruction misstates the law, and the instruction probably caused the rendition of an improper judgment.

Chapter 92, subchapter B of the Property Code prescribes a landlord's duty to repair or remedy leased premises. Section 92.052, which is part of the subchapter, requires landlords to "make a diligent effort to repair or remedy" conditions of which they have written notice. Section 92.054 applies to repairs due to casualty losses covered by insurance. Section 92.055 applies when a landlord elects to close premises altogether. The

---

9. 41 Tex. Sup. Ct. J. 34 (Oct. 16, 1997).

10. 845 S.W.2d 262 (Tex.1992).

11. *Id.* at 264.

12. *See* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 65.1B (1997).

13. *Keetch*, 845 S.W.2d at 267; *see* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 65.1A (1997).

14. *See, e.g., Lefmark Management Co. v. Old*, 946 S.W.2d 52, 53 (Tex.1997); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995); *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993).

statute gives a tenant both non-judicial and judicial remedies for a landlord's violation. Under Section 92.056, the tenant may make repairs costing no more than the greater of $500 or one month's rent and deduct the cost from rent payments, or the tenant may terminate the lease. Under Section 92.0563, a tenant may sue for

(1) an order directing the landlord to take reasonable action to repair or remedy the condition;

(2) an order reducing the tenant's rent, from the date of the first repair notice, in proportion to the reduced rental value resulting from the condition until the condition is repaired or remedied;

(3) a judgment against the landlord for a civil penalty of one month's rent plus $500;

(4) a judgment against the landlord for the amount of the tenant's actual damages; and

(5) court costs and attorney's fees, excluding any attorney's fees for a cause of action for damages relating to a personal injury.

Section 92.058 provides landlords remedies against tenants who violate the statute.

The applicability of subchapter B is limited by Section 92.061, which states:

The duties of a landlord and the remedies of a tenant under this subchapter are in lieu of existing common law and other statutory law warranties and duties of landlords for maintenance, repair, security, habitability, and nonretaliation, and remedies of tenants for a violation of those warranties and duties. Otherwise, this subchapter does not affect any other right of a landlord or tenant under contract, statutory law, or common law that is consistent with the purposes of this subchapter or any right a landlord or tenant may have to bring an action for personal injury or property damage under the law of this state. This subchapter does not impose obligations on a landlord or tenant other than those expressly stated in this subchapter.

Hardly a model of clarity, Section 92.061 appears self-contradictory. The first sentence preempts landlords' common law duties "for maintenance, repair, security, habitability, and nonretaliation", while the second sentence "otherwise" preserves tenants' rights to sue for personal injuries under the common law. The first sentence read literally makes the second sentence entirely superfluous. The only actions not preempted would be those not covered by the first sentence. But the second sentence appears to suggest that the preemptive effect of the first sentence is limited.

To determine the meaning of the statute, we look to its purpose. The statute was passed [15] in the legislative session following our decision in *Kamarath v. Bennett*, [16] which recognized for the first time in Texas an implied warranty of habitability existing between a landlord and a tenant. In that case the tenant sued for economic damages caused by latent defects in his residential apartment. The Court held that

in a rental of a dwelling unit, whether for a specified time or at will, there is an implied warranty of habitability by the landlord that the apartment is habitable and fit for living. This means that at the inception of the rental lease there are no latent defects in the facilities that are vital to the use of the premises for residential purposes and that these essential facilities will remain in a condition which makes the property livable.

\* \* \*

In order to constitute a breach of implied warranty of habitability the defect must be of a nature which will render the premises unsafe, or unsanitary, or otherwise unfit for living therein. [17]

---

**15.** Act of May 28, 1979, 66th Leg., R.S., ch. 780, 1979 Tex. Gen. Laws 1978 (Tex.Rev.Civ. Stat. Ann. art. 5236f), *repealed and recodified by* Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3632–3639, 3730 (adopting the Property Code).

**16.** 568 S.W.2d 658 (Tex.1978).

**17.** *Id.* at 660–661.

The Legislature enacted the statute that is now subchapter B to replace the broad language of *Kamarath* with more specific minimum standards of habitability, a method for enforcing those standards, and remedies for a landlord's noncompliance. The legislation's sponsor and supporters urged enactment because of fears that *Kamarath* had created a vague standard that landlords would have difficulty satisfying.[18]

The preemption provision, section 14 of the 1979 law,[19] was virtually identical to current Section 92.061. The 1979 Act was amended and recodified in 1983.[20] Although the recodification altered the language contained in Section 92.061, the Legislature reversed the changes two years later through a "clean-up" bill which reinserted inadvertently omitted language into the statute.[21] In essence, the 1985 amendments conformed the 1983 recodification to the original statutory language of 1979.

It thus appears that subchapter B was intended to govern disputes between a landlord and a tenant over repairs and not liability for personal injuries resulting from premises defects actionable under the common law. Viewed in light of the statute's purpose, the first two sentences of Section 92.061 are reconciled by limiting their preemptive effect to such matters comprehended within the implied warranty of habitability *Kamarath* recognized. The only other court to have addressed this issue has reached the same conclusion.[22] Given this limited applicability of subchapter B, it follows that the district court's instruction based on Section 92.052 has no applicability to this case. While it correctly states a landlord's obligation to repair, it does not apply in a personal injury case and should not have been included in the charge.

■ Cain argues that the instruction was harmful because the jury may have misread the instruction to say not merely that a landlord must make repairs if a tenant gives notice of a condition, but that a landlord must make repairs if *and only if* a tenant gives such notice. Error in instructions to the jury is more likely to be harmful in a closely contested case.[23] In this case, there was a vigorous dispute at trial over the requirement of written notice. Cain adduced evidence that Timberwalk often accepted and responded to oral requests for repairs, while Timberwalk and Sovereign insisted that tenants were required to provide written notice. It was undisputed that Cain never gave Timberwalk written notice of any of the defects she alleges in this action.

Moreover, in summation, Timberwalk's attorney focused the jury's attention on the instruction and plainly misstated it:

The Court has told you in the charge that the landowner's duty to make repairs only exists on receipt of a written notice. Read this, read this real carefully when you go back there. This is the duty that the judge is giving you. This is the law you're instructed to follow.

There is no evidence of any written notice. They've all admitted that. Phyllis didn't give one; Tammie didn't give one. Where does the duty exist?

The court should have corrected this mischaracterization of the charge. So flagrant a misstatement trespasses on even the broad latitude allowed in summation and invites reversal.

**18.** *See* Debate on Tex. H.B. 1773 before the House Comm. on Bus. & Indus., 66th Leg., R.S. (Mar. 19, 1979) (including favorable testimony from representatives of the Texas Apartment Association, the Texas Association of Builders, Inc., and the Texas Association of Realtors)(available from H.R. Video/Audio Servs.).

**19.** Act of May 28, 1979, 66th Leg., R.S., ch. 780, § 14, 1979 Tex. Gen. Laws 1978, 1983 (repealed).

**20.** *See* Act of May 26, 1983, 68th Leg., R.S., ch. 576, 1983 Tex. Gen. Laws 3475, 3632 (eff.Jan. 1, 1984).

**21.** *See* Debate on H.B. 1550 before the Senate Comm. on State Affairs, 69th Leg., R.S., ch. 200 (May 5, 1985).

**22.** *Moreno v. Brittany Square Assocs.*, 899 S.W.2d 261, 262–263 (Tex.App.—Houston [14th Dist.] 1995, writ denied).

**23.** *See Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex.1995).

Cain objected to the instruction on the ground that it would be "misleading and confusing to the jury". In determining whether error in the charge "probably caused the rendition of an improper judgment"[24] so as to require reversal, we analyze the entire record.[25] Given the vigorous evidentiary dispute over the significance of written notice and counsel's closing argument, we conclude that the surplus instruction probably did improperly and unduly nudge the jury to find against Cain. Accordingly, we agree with the court of appeals that the district court's error in instructing the jury regarding Section 92.052 was reversible error.

## III

But the charge error does not require a new trial for Timberwalk if, as it argues, it had no duty to provide security measures as Cain alleges because there is no evidence that it could reasonably have foreseen the likelihood of violent criminal activity within its apartment complex. Whether a duty exists is a question of law for the court to decide.[26]

## A

 As a rule, "a person has no legal duty to protect another from the criminal acts of a third person".[27] An exception is that "[o]ne who controls ˙... premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unrea-

sonable and foreseeable risk of harm to the invitee."[28] The exception applies, of course, to a landlord who "retains control over the security and safety of the premises".[29] "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable."[30] When the "general danger" is the risk of injury from criminal activity, the evidence must reveal "specific previous crimes on or near the premises" in order to establish foreseeability.[31]

 The foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a person who owns or controls premises to protect others on the property from the risk. Once this prerequisite is met, the parameters of the duty must still be determined. "Foreseeability is the beginning, not the end, of the analysis in determining the extent of the duty to protect against criminal acts of third parties."[32]

 "[C]rime may be visited upon virtually anyone at any time or place",[33] but criminal conduct of a specific nature at a particular location is never foreseeable merely because crime is increasingly random and violent and may possibly occur almost anywhere, especially in a large city. If a landowner had a duty to protect people on his property from criminal conduct whenever crime *might* occur, the duty would be universal. This is not the law. A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable.

---

**24.** Tex.R.App. P. 61.1(a) (setting forth the standard for reversible error); *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984).

**25.** *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 921 (Tex.1979) (stating that a legal error occasions an unfair trial if the trial is contested and the evidence is sharply conflicting); *see also Lorusso v. Members Mut. Ins. Co.,* 603 S.W.2d 818, 821–822 (Tex.1980) (refusing to find reversible error because no evidence indicated that the case was sharply contested).

**26.** *Lefmark,* 946 S.W.2d at 53; *Centeq,* 899 S.W.2d at 197.

**27.** *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex. 1996); *Centeq,* 899 S.W.2d at 197; *see also Lefmark,* 946 S.W.2d at 53.

**28.** *Lefmark,* 946 S.W.2d at 53; *see* Restatement (Second) of Torts § 344 (1965).

**29.** *Centeq,* 899 S.W.2d at 197; *see Walker,* 924 S.W.2d at 377.

**30.** *Walker,* 924 S.W.2d at 377; *see also* 2 Harper & James, The Law of Torts § 20.5(6), at 1147 (1956) ("Foreseeability does not mean that the precise hazard or the exact consequences which were encountered should have been foreseen.").

**31.** *Walker,* 924 S.W.2d at 377.

**32.** *Lefmark,* 946 S.W.2d at 59 (Owen, J., concurring).

**33.** *Id.* at 56 (Owen, J., concurring).

Whether such risk was foreseeable must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred. In determining whether the occurrence of certain criminal conduct on a landowner's property should have been foreseen, courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them.[34] We elaborate on each of these factors.

### 1

■ For a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity.[35] Criminal activity occurring farther from the landowner's property bears less relevance because crime rates may be expected to vary significantly within a large geographic area. This is not to say that evidence of remote criminal activity can never indicate that crime is approaching a landowner's property.[36] But such evidence must be especially strong, and must show that the risk of criminal conduct on the landowner's property is not merely increasing but has reached a level as to make crime likely.

Most courts have looked to narrow geographic areas in analyzing the foreseeability of criminal conduct.[37] A few courts have examined criminal activity occurring in broader geographic areas.[38] Statistics regarding large or undefined geographic areas do not by themselves make crime foreseeable at a specific location.[39] Even if a city's overall crime rate has risen, specific areas within the city may remain crime free. Likewise, merely because several crimes have occurred at a particular ATM located in a high-crime area does not render it more likely that future crimes will occur at every ATM the bank owns. For a risk to be foreseeable, there must also be evidence of criminal activity within the specific area at issue, either on the landowner's property or closely nearby.

### 2

■ Foreseeability also depends on how recently and how often criminal conduct has

---

**34.** *See generally Boren v. Worthen Nat'l Bank*, 324 Ark. 416, 921 S.W.2d 934, 941 (1996) (considering the "similarity, frequency, location, and proximity in time of the prior incidents"); *Jacqueline S. v. City of New York*, 81 N.Y.2d 288, 598 N.Y.S.2d 160, 614 N.E.2d 723, 726 (1993) (analyzing the "location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question").

**35.** *See Walker*, 924 S.W.2d at 377 (considering crime rates at the apartment complex and a residential neighborhood across the street).

**36.** *See Gans v. Parkview Plaza Partnership*, 253 Neb. 373, 571 N.W.2d 261, 268 (1997) ("[I]t does not necessarily follow that the prior similar criminal activity must have taken place at the premises; it is required only that the criminal act or acts occurring near the premises in question give notice of the risk that crime may travel to the premises of the business owner".).

**37.** *See Henley v. Pizitz Realty Co.*, 456 So.2d 272, 273 (Ala.1984) (the landowner's parking ramp); *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 48–49 (Colo.1987)'(a particular restaurant); *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 482 S.E.2d 339, 341 (1997) (an apartment complex); *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 170 (Minn.1989) (the landowner's parking ramp and the adjacent hotel); *Speaker v. Cates Co.*, 879 S.W.2d 811, 814–815 (Tenn.1994) (the landowner's apartment complex); *Holley v. Mt. Zion Terrace Apts., Inc.*, 382 So.2d 98, 99–100 (Fla.Dist. Ct.App.1980) (the landowner's apartment complex); *Petrauskas v. Wexenthaller Realty Management, Inc.*, 186 Ill.App.3d 820, 134 Ill.Dec. 556, 542 N.E.2d 902, 906 (1989) (the landowner's apartment complex).

**38.** *See Boren v. Worthen Nat'l Bank*, 324 Ark. 416, 921 S.W.2d 934, 942 (1996) (considering evidence of criminal activity at all of the defendant's ATM's, not merely the one at which plaintiff had been injured).

**39.** *See Habich v. Crown Cent. Petroleum Corp.*, 642 So.2d 699, 700 (Ala.1994) (stating that evidence regarding crimes at convenience stores across the state was no evidence that crime at a particular store was foreseeable); *Martinko v. H–N–W Assocs.*, 393 N.W.2d 320, 322 (Iowa 1986) (" "[W]hether some crimes occurred at the defendants' other malls in other cities, states, or countries is not probative of foreseeability in this case."); *Pamela W. v. Millsom*, 25 Cal.App.4th 950, 30 Cal.Rptr.2d 690, 694 (1994) ("[T]here is little utility in evidence that, for example, the Pacific Beach area of San Diego is a 'high crime area.' ").

occurred in the past. The occurrence of a significant number of crimes within a short time period strengthens the claim that the particular crime at issue was foreseeable.[40] On the other hand, the complete absence of previous crimes, or the occurrence of a few crimes over an extended time period, negates the foreseeability element.[41]

### 3

■■■ The previous crimes must be sufficiently similar to the crime in question as to place the landowner on notice of the specific danger. Thus, we have held that the stabbing of a guest at an apartment complex was not foreseeable from four prior incidents of vandalism and the theft of a refrigerator from a vacant apartment.[42] The prior crimes need not be identical. A string of assaults and robberies in an apartment complex make the risk of other violent crimes, like murder and rape, foreseeable. On the other hand, a spate of domestic violence in the complex does not portend third party sexual assaults or robberies.

Assessing this factor is difficult because "[c]riminal activity is not easily compartmentalized."[43] Property crimes may expose a dangerous condition that could facilitate personal crimes, as when apartments are targeted repeatedly by thieves. "If a burglar may enter [an apartment], so may a rapist."[44] An apartment intruder initially intent upon stealing may decide to assault a tenant discovered inside, even if the tenant avoids confrontation. In contrast, vandalism to automobiles in an apartment complex's parking lot can be a serious concern, but it does not suggest the likelihood of sexual assault.

### 4

■■■ The publicity surrounding the previous crimes helps determine whether a landowner knew or should have known of a foreseeable danger. A landlord often has actual knowledge of previous crimes occurring on the premises through tenants' reports. Actual notice of past incidents strengthens the claim that future crime was foreseeable.[45] However, unreported criminal

**40.** *See Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 48 (Colo.1987) (ten incidents within three years); *Jardel Co. v. Hughes,* 523 A.2d 518, 525–526 (Del.1987) (394 incidents within two and one-half years); *Galloway v. Bankers Trust Co.,* 420 N.W.2d 437, 439 (Iowa 1988) (approximately 40 incidents within one year); *Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 167 (Minn.1989) (85 incidents within three or four years); *Butler v. Acme Markets, Inc.,* 89 N.J.2d 270, 445 A.2d 1141, 1142, 1144 (1982) (seven incidents within one year); *Trentacost v. Brussel,* 82 N.J. 214, 412 A.2d 436, 438 (1980) (75 to 100 incidents within three years).

**41.** *See Walker,* 924 S.W.2d at 377 (affirming summary judgment for an apartment owner in part because no violent crimes had occurred at the premises); *Henley v. Pizitz Realty* Co., 456 So.2d 272, 277 (Ala.1984) (affirming summary judgment for a parking·ramp owner because the plaintiff's sexual assault was unforeseeable in light of only 17 previous crimes over a ten-year period); *Boren v. Worthen Nat'l Bank,* 324 Ark. 416, 921 S.W.2d 934, 942 (1996) (holding that a · bank could not foresee an assault at one of its ATMs based on two previous crimes within the eight preceding years); *Uihlein v. Albertson's, Inc.,* 282 Or. 631, 580 P.2d 1014, 1019 (1978) (holding that an assault in a grocery store was not foreseeable because no robberies or assaults had ever occurred in the store); *Willmon v. Wal–Mart Stores, Inc.,* 957 F.Supp. 1074, 1079 (E.D.Ark.1997) ("Because there are no reports of prior similar crimes occurring on the Wal–Mart

Supercenter parking lot, the [crime] was unforeseeable".); *see also Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 526–527 (1990)(holding that a cab company could not foresee an employee's criminal act based upon one prior incident in a twenty year period; and in that one case, the driver had been exonerated of wrongdoing).

**42.** *Walker,* 924 S.W.2d at 377–378. *See Doe v. Briargate Apartments, Inc.,* 227 Ga.App. 408, 489 S.E.2d 170, 173 (1997) (opining that the previous incidents need not be identical, but need only "attract the landlord's attention to the dangerous condition which resulted in the litigated incident") (citation omitted).

**43.** *Jardel Co. v. Hughes,* 523 A.2d 518, 525 (Del. 1987); *see also Galloway v. Bankers Trust Co.,* 420 N.W.2d 437, 439 (Iowa 1988) ("We do not believe, however, that crimes initially directed toward property are without any probative value on the question of foreseeability of injury.").

**44.** *Aaron v. Havens,* 758 S.W.2d 446, 448 (Mo. 1988).

**45.** *See Cordes v. Wood,* 918 P.2d 76, 80 (Okla. 1996) (reversing summary judgment for the landlord because a fact issue existed whether the plaintiff, a tenant who was sexually assaulted in her apartment, had reported to her landlord a previous attempted break-in).

activity on the premises is no evidence of foreseeability. Previous similar incidents cannot make future crime foreseeable if nobody knows or should have known that those incidents occurred. Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area. On the other hand, when the occurrence of criminal activity is widely publicized, a landlord can be expected to have knowledge of such crimes.

## B

These factors—proximity, recency, frequency, similarity, and publicity—must be considered together in determining whether criminal conduct was foreseeable. Thus, the frequency of previous crimes necessary to show foreseeability lessens as the similarity of the previous crimes to the incident at issue increases. The frequent occurrence of property crimes in the vicinity is not as indicative of foreseeability as the less frequent occurrence of personal crimes on the landowner's property itself. The court must weigh the evidence using all the factors.

The evidence in the present case is that no violent personal crime occurred at the Timberwalk Apartments for ten years preceding Cain's sexual assault. The only crimes that had occurred in the complex were the tire-slashing by Cain's roommate's ex-boyfriend, and a car burglary and car theft at an earlier, unspecified time. In the year preceding Cain's sexual assault, only one sexual assault had occurred within a one-mile radius of the Timberwalk Apartments. That same year, six assault-type crimes occurred in neighboring apartment complexes. There is no evidence that any of these crimes was ever reported in the media, or that Timberwalk knew or had any way of knowing about them.

Applying the factors we have set out to the facts before us, we conclude that the risk that a tenant would be sexually assaulted was in no way foreseeable to Timberwalk. Therefore, as a matter of law, Timberwalk owed Cain no duty to provide additional security beyond that required by statute and by the lease.

* * * * *

Because Timberwalk owed Cain no duty to provide additional security as a matter of law, it is entitled to judgment notwithstanding the error in the jury charge. As we have noted, however, Sovereign does not argue that it owed Cain no duty. Thus the charge error requires that Cain's claims against Sovereign be remanded for further proceedings, as the court of appeals concluded. Accordingly, we affirm the judgment of the court of appeals as to Sovereign, reverse as to Timberwalk, and render judgment that Cain take nothing against Timberwalk.

SPECTOR, J., filed a concurring opinion.

SPECTOR, Justice, concurring.

While I agree with the Court's remand of Sovereign's claim on the charge issue, I disagree with the Court's duty analysis. Accordingly, I do not join Part III of the Court's decision.

In determining whether a premises owner has a duty to provide additional security, other than that required by a lease or applicable statute, the Court today holds that "for a risk to be foreseeable, there must … be evidence of criminal activity within the specific area at issue, either on the landowner's property or closely nearby." S.W.2d , . In other words, the Court holds that absent evidence of recent, similar criminal activity in the specific area, as a matter of law there cannot be a foreseeable risk of harm to someone like Cain. I disagree.

Certainly, one of the factors to weigh in assessing foreseeability of risk is whether there have been other similar incidents in the immediate vicinity. However, I would hold that other types of evidence may also establish foreseeability. For example, the "nature, condition and location of the defendant's premises" should be considered by the Court in determining whether to impose a duty on the landowner. *Isaacs v. Huntington Mem'l Hosp.*, 38 Cal.3d 112, 211 Cal. Rptr. 356, 695 P.2d 653, 661 (1985); *see also* RESTATEMENT (SECOND) OF TORTS § 344 cmt. f (1965) ("If the place or *character* of [a] business … is such that [the landowner] should reasonably anticipate careless or criminal

**760**

conduct on the part of third persons, either generally or at some particular time, [the landowner] may be under a duty to take precautions against it ....") (emphasis added).

If the place or character of a business is such that the landowner may be said to have created "an especial temptation and opportunity for criminal misconduct," W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 33, at 201 (5th ed.1984), then this also is a factor to consider in determining whether criminal conduct is foreseeable. Here, however, Cain presented no evidence that the character, use made, or location of the apartment complex created a heightened risk of foreseeable criminal conduct. I therefore concur in the Court's rendition of judgment for Timberwalk.