IN THE SUPREME COURT OF TEXAS














IN THE SUPREME COURT OF TEXAS

 

════════════

No. 07-0091

════════════

 

Trammell Crow Central Texas,
Ltd., Petitioner,

 

v.

 

Maria Gutierrez, Individually
and as Representative of the Estate of Luis Gutierrez; and Karol Ferman as Natural Parent and as Next Friend of Luis Angel
Gutierrez, Respondents

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Fourth District of Texas

════════════════════════════════════════════════════

 

 

Argued January 17,
2008

 

 

            Justice Willett delivered the opinion of
the Court, in which Justice O’Neill, Justice
Wainwright, Justice Medina, and Justice Green
joined.

 

            Chief
Justice Jefferson filed a concurring opinion, in which Justice Hecht, Justice Brister, and Justice
Johnson joined.

            Ten years ago, we noted that “crime
may be visited upon virtually anyone at any time or place,”[1]
and unfortunately, the same is true today. Given the pervasive and often random
nature of crime in our society, we have avoided imposing a universal duty on
landowners to protect persons or their property from third-party criminal acts.[2]
However, we have also recognized that, in some circumstances, the risk of a
crime may be sufficiently unreasonable and foreseeable to justify imposing a
duty on landowners to protect invitees while they are on the landowner’s
property.[3] The parties
dispute whether the facts of this case give rise to the exception to the
no-duty rule. We conclude they do not; accordingly, we reverse the court of
appeals and render judgment in favor of Trammell Crow Central Texas, Ltd.
(Trammell Crow).

 I. Background

            Around 11 o’clock on the night of
February 17, 2002, Patrick Robertson, an off-duty policeman, began his shift as
a security guard at the Quarry Market, a 53-acre mall in San Antonio. Following standard procedure,
Robertson patrolled the parking lots in an unmarked car while dressed in his
police uniform. Shortly after midnight, while driving slowly past the front of the
movie theater, he noticed two people he thought were dressed in black hats and
jackets standing by the payphones located just to the side of the theater
entrance. He made eye contact with them, and they acknowledged his presence. He
continued his patrol, heading away from the theater as patrons began exiting
the building.

            Among those patrons were Luis
Gutierrez and his wife Karol Ferman, who had just
finished watching a movie and were heading towards their car. Shortly after
exiting the building, Karol heard a gunshot. She turned in the direction of the
sound and saw a person dressed in black and wearing a ski mask pointing a gun
towards her and Luis. The assailant fired again, hitting Luis in the shoulder
and causing him to fall to the ground. Luis got back up, and the couple began
running. Karol was only able to run a short distance before she fell face-first
to the ground and crawled under a nearby car for protection. Although Karol did
not hear any more shots, Luis suffered four gunshot wounds: one in the
shoulder, two in the back, and one in the back of the head.

            Robertson, who was only a few
hundred feet away from the theater when the shots were fired, drove to where
Luis lay wounded, secured the crime scene, and notified the police dispatcher
of the incident. Meanwhile, security personnel in a different part of the mall
saw someone run through a breezeway and get into a green jeep. The security
officers chased the jeep onto a nearby road but discontinued the chase when the
jeep’s occupants fired shots at their vehicle.

            Luis was taken to the hospital,
where he died of his wounds. Police classified the crime as a homicide and
began an investigation, but criminal charges were never filed. Luis’s mother
Maria and Karol, acting for themselves and for Luis’s children, filed a civil
suit against Trammell Crow, the property manager of the Quarry Market. Maria
and Karol alleged that Trammell Crow negligently failed to provide adequate
security at the mall. During the trial, the parties developed competing
theories to give context to the otherwise seemingly random attack.

            Maria and Karol portrayed the attack
as a botched robbery. Karol testified that she saw Luis grab his wallet before
they left home for the theater. Although the police recovered other valuables
at the crime scene—a watch, a cell phone, keys, some cash, and a broken
bracelet—the wallet was never found. Plaintiffs’ expert criminologist testified
that the absence of Luis’s wallet indicated that a robbery had occurred and
that attackers intent on murdering a victim would not
likely have taken the time to loot the body before fleeing the scene.

            Trammell Crow countered that Luis
was killed in retaliation for providing the police with information regarding a
series of burglaries in which he was involved. A few weeks before Luis’s death,
police officers arrested Luis after finding a stolen watch in his home. Faced
with possible charges of possession of stolen property and burglary, Luis
provided information about the burglaries and those who committed them. A few
weeks later, Luis asked the police for money to relocate after he received
threatening messages from those involved in the burglary ring. The officer told
Luis that additional protection might be available, but Luis said that he could
get himself out of trouble. So the officer gave Luis $250; Luis was killed one
week later.

             At the close of trial, the
jury returned a verdict in favor of Maria, Karol, and the children, and the
trial court signed a judgment conforming to the verdict, awarding the
plaintiffs over $5 million in damages. Sitting en banc, the court of appeals
affirmed in a sharply divided opinion, holding that Trammell Crow owed a duty
to Luis as a matter of law and that the evidence was sufficient to support the
jury’s finding that Trammell Crow breached its duty in a way that proximately
caused Luis’s death.[4] Trammell Crow
contends that the court of appeals erred on both points, arguing that no duty
exists because Luis’s death was unforeseeable and that any failure on Trammell
Crow’s part did not proximately cause Luis’s death. We begin with the duty
question.

II.
Discussion

            The existence of a duty is a
question of law determined by the court.[5] Generally, a
person does not have a duty to protect others from third-party criminal acts.[6]
However, “[o]ne who controls the premises does have a
duty to use ordinary care to protect invitees from criminal acts of third
parties if he knows or has reason to know of an unreasonable and foreseeable
risk of harm to the invitee.”[7] Foreseeability is established through evidence of
“‘specific previous crimes on or near the premises.’”[8]

            The evidence establishes that
Trammell Crow exercised control over security at the Quarry Market. Current and
former Trammell Crow property managers testified that they controlled key
aspects of security, including the number of guards on premises and the
equipment available to them. Trammell Crow hired off-duty police officers to
provide security for the Quarry Market common areas at all times. It also hired
a security agency to provide additional security for specific projects. At peak
times, three to four security guards patrolled the mall. While working at the
mall, the security guards wore their official police uniforms and carried their
standard police equipment. The security guards had the discretion to patrol the
mall on foot, on bikes, or in unmarked cars, but generally preferred patrolling
on bikes, which allowed them to be highly visible, fully mobile during high-traffic
periods, and more aware of their surroundings. However, at night, the guards
generally preferred to use unmarked cars so they could cover ground more
quickly and avoid attracting the attention of potential criminals, thus making
it easier to catch criminals in the act of their crimes. Trammell Crow placed
responsibility for scheduling the officers with one of the security guards, but
the property managers discussed ongoing security matters with the guards on a
daily basis and adjusted the security plans as needed. For example, more guards
were utilized during the high-density holiday season. When guards expressed
concern over teenage loitering at the movie theater, Trammell Crow discussed
the matter with the theater owners, who responded by providing their own guard
during the weekends.

            Trammell Crow does not dispute the
issue of control, nor does it dispute Luis’s status as an invitee. Instead,
Trammell Crow contends that the evidence of previous criminal activity at the
mall does not establish that Luis’s death was foreseeable.

A.
Evidence of Prior Crimes

            In the two years prior to Luis’s
death, 227 crimes were reported at the Quarry Market. Of these reported crimes,
203 were property and property-related crimes—mostly thefts, but also a handful
of burglaries, auto thefts, and incidents of vandalism. Fourteen “other crimes”
occurred—thirteen simple assaults[9] and one
incident of weapon possession. The remaining ten crimes, all robberies, were
classified as violent crimes—a category that also includes murder,
manslaughter, rape, and aggravated assault.

            Although criminal conduct is
difficult to compartmentalize,[10]
some lines can be drawn. For instance, we have held that reports of vandalism,
theft, and neighborhood disturbances are not enough to make a stabbing death
foreseeable.[11]
Similarly, although the repeated occurrences of theft, vandalism, and simple
assaults at the Quarry Market signal that future property
crimes are possible, they do not suggest the likelihood of murder.[12]
Accordingly, like the court of appeals, we limit our review to the ten instances
of violent crime that took place at the Quarry Market during the two years
prior to Luis’s death. The police records of these undisputed incidents were
accurately summarized by the court of appeals as follows:

1. Wednesday, March
29, 2000 at 6:40 p.m.—As a woman exited a store, a man
grabbed her purse. She pulled back; but he pushed her, over-powered her and
took her purse, ran off, and got into a waiting vehicle. When a witness tried
to block the suspect with her vehicle, he rammed her car and fled. This crime
was classified by the [San Antonio Police Department (SAPD)] as “robbery.”

 

2. Monday, April 17,
2000 at 12:30 a.m.—As a man was exiting the movie
theater, two men asked if he was “some big shot” and followed the man back into
the theater. The two suspects then began to hit the man, knocking him down, and
reached into his pocket and took his money, credit cards, necklace, and
military ID. The complainant said someone told the suspects to leave him alone,
and they fled in a vehicle with a third suspect. The complainant also said the
suspects dropped a cellular phone as they were assaulting him. This crime was
classified by the SAPD as a “robbery-bodily injury.”

 

3. Sunday, May 7,
2000 at 1:10 a.m.—As a man was walking from a store to
his vehicle, two people in a passing car first asked for directions and then
said, that if he did not want to die, he should give them his wallet. When the
man said he did not have a wallet, the people in the car asked him for his
pager, cellular telephone, and keys. While the man relinquished these items,
one of the suspects pointed an unknown object covered by a black trash bag. This
crime was classified by the SAPD as “robbery-deadly weapon.” 

 

4. Saturday, May 20,
2000 at 6:53 p.m.—A suspect entered a store, told an
employee he had a heat-activated hand grenade, and demanded money. The employee
complied, turning over approximately $750. The purported hand grenade was found
to be simulated. When the suspect fled on foot to his
vehicle, two off-duty officers working security attempted, on their bicycles,
to pursue the vehicle as it left the parking space but they were unable to get
close enough to get the license plate number. This crime was classified
by the SAPD as “aggravated robbery.”

 

5. Monday, December
18, 2000 at 7:24 p.m.—While seated inside a
restaurant, a woman’s purse was stolen. When she pursued the purse snatcher
into the parking lot, he pushed her away, jumped into the passenger side of a
waiting vehicle, and sped away. This crime was classified by the SAPD as
“robbery-bodily injury.”

 

6. Wednesday,
December 20, 2000 at 7:35 p.m.—A suspect entered a
bank located inside a Quarry Market store and presented the teller a
handwritten note. The note stated that it was a robbery and the teller should
not move or he would be killed and demanded the money in the top drawer. The
suspect then handed the teller a large manilla
envelope and told the teller to put the note and the money in the top and
bottom drawers in the envelope. As the suspect left, he told the teller there
were three others in the store with him. This crime was classified by the SAPD
as “robbery.”

 

7. Monday, July 9,
2001 at 9:44 p.m.—As a man was sitting in his car with
his girlfriend, a suspect tapped on his window with a gun, told the man he
needed his vehicle, gave the man time to remove his belongings from the car,
and then took the car. This crime was classified by the SAPD as “aggravated
robbery-deadly weapon.”

 

8. Monday, October
22, 2001 at 11:45 p.m.—As a woman and her companion
were walking in the parking lot, they noticed a man standing in front of a
parked car, inside of which another individual sat in the driver's seat. The
man approached the couple and asked for the time. The woman gave the man the
time; and the two continued walking away. The man then demanded their money. As
they continued walking, the driver in the parked car stepped out of the car and
pointed a gun at them that looked like an Uzi and told the woman “get on the floor
and give me all your money or I’m oging [sic] to kill
you!!!” Fearing for their lives, the couple was going to comply. The first man
then grabbed the woman’s purse, and told the couple not to turn around and look
at him. He got into the car, and fled with the other man. This crime was
classified by the SAPD as “aggravated robbery-deadly weapon.”

 

9. Sunday, January
13, 2002 at 5:48 p.m.—As a woman started to open her
car door, a suspect placed an arm around her, placed a gun to her chest, and
told her to give him her purse. The suspect fled in a vehicle. This crime was
classified by the SAPD as “aggravated robbery-deadly weapon.”

 

10. Thursday,
January 24, 2002 at 2:05 p.m.—When a store manager chased a shoplifting suspect
out into the parking lot to get the suspect’s license plate number, the suspect
got into a vehicle and steered his vehicle towards the manager, striking the
manager’s left elbow with the driver’s side mirror and causing the manager to
spin and fall. This crime was classified by the SAPD as “robbery-bodily
injury.”[13]

 

B.
Foreseeability

            To determine whether the risk of
criminal conduct is foreseeable, a court weighs the evidence of prior crimes
using five factors: proximity, publicity, recency,
frequency, and similarity.[14]
The evidence is not considered “in hindsight but rather in light of what the
premises owner knew or should have known before the criminal act occurred.”[15]
Proximity and publicity are not disputed in this case: the ten violent crimes
described above all occurred at the Quarry Market, and Trammell Crow knew about
these crimes at the time of Luis’s death. Therefore, we focus our analysis on
the other factors: recency, frequency, and
similarity.

1.
Recency and Frequency

            Although the five factors present
distinct considerations, we have previously examined recency
and frequency in tandem.[16]
A criminal act is more likely foreseeable if numerous prior crimes are
concentrated within a short time span than if few prior crimes are diffused
across a long time span.[17]
For example, in Mellon Mortgage Co. v. Holder, we held that a rape was
foreseeable when it took place in an area that had witnessed 190 violent crimes
in the space of two years, or one violent crime every four days.[18]
In contrast, the Quarry Market was home to ten violent crimes committed over a
23-month period prior to Luis’s murder, equating to one violent crime every
sixty-nine days. A direct comparison between these cases is not definitive,
since Holder arose in a different city with a different crime rate. However,
statistics from the San Antonio
area suggest that the Quarry Market has a relatively low rate of violent
criminal activity. In 2001, a resident of San
 Antonio faced a 44,760-to-1 chance of becoming the
victim of a violent crime on any given day. In contrast, according to
calculations performed by Trammell Crow’s expert, the odds of suffering a
violent crime on any given day at the Quarry Market during the two years prior
to Luis’s death were 1,637,630 to 1.

            Maria and Karol contend that these
calculations compare “apples to oranges” because comparing crime rates between
a city and a location within the city will not take into account the mobility
of the city’s population. They also argue that reliance on the citywide crime
rate will lead to an incomplete and misleading analysis that fails to include
important geographic and demographic considerations. They are certainly right
that numeric comparisons may be imperfect and may omit important,
less-easily-quantified considerations. Furthermore, we emphasize that no one
ratio or odds calculation conclusively resolves the frequency analysis. Crime
counts, crime rates, odds calculations, and other comparisons merely serve as
data points a court may rely on in determining the frequency of crime in a
certain location; just as the frequency analysis is merely one factor in the
total foreseeability analysis. Nevertheless, these
calculations, performed by a qualified expert, can be used to help a court
resolve the difficult question of whether criminal conduct is reasonably
foreseeable.

2.
Similarity

            In addition to the recency and frequency of past crimes, a court must consider
the similarity of the past crimes to the criminal conduct in question.[19]
Foreseeability does not require “the exact sequence
of events that produced the harm [to] be foreseeable,”[20]—rather,
previous crimes need only be “sufficiently similar to the crime in question as
to place the landowner on notice of the specific danger.”[21]
Furthermore, we have recognized that crimes fitting one category can relate to
or result in crimes of another category: a string of violent crimes such as
robberies or assaults can make other violent crimes like murder or rape
foreseeable; a thief entering a dwelling to steal property may also commit
personal crimes.[22]

            No one had been murdered at the
Quarry Market prior to Luis’s shooting, but ten robberies had occurred, many
with violent characteristics. One of the incidents is particularly striking—a
man exiting the theater at 12:30 a.m. on a Monday morning was approached by a
group of strangers, who followed him back into the theater, knocked him down,
and stole his valuables before fleeing the scene. However, unlike the attack on
Luis, the strangers first accosted the victim; their ultimate aim was to take
his property; and they did not use a deadly weapon or seriously injure him.

            Of the remaining nine crimes, three
involved the use of guns, and another involved an unknown object that could
have been a gun. However, none of these weapons were ever fired. Three of the
nine incidents involved the use of physical force, and four others involved a
threat of serious injury or death. However, unlike the attack on Luis, in all
three situations involving physical contact, the suspect used force only after
the victim pursued the suspect or otherwise tried to regain possession of the
stolen items. Furthermore, no one was seriously injured in any of the nine
robberies. Two other differences are noteworthy. First, in six of the nine
crimes, the perpetrator made a demand on the victim for property, indicating
that the primary purpose of the criminal conduct was to obtain property. There
is no evidence that Luis’s assailant made any demand, threat, or said anything
at all; the assailant simply started shooting. Second, three of the robberies
were perpetrated on businesses—two stores and a bank—rather than individuals,
like the attack on Luis.

3.
Application

            Considering the five factors
together, we cannot conclude that Luis’s murder was foreseeable. Trammell Crow
had knowledge of violent crimes that were committed at the Quarry Market within
a reasonable time prior to Luis’s death. Nevertheless, these previous crimes
were not sufficiently frequent and similar to give rise to a duty in this case.
Only four times in two years were robberies committed without a prior demand
for property. Only three times in two years was a weapon clearly used to commit
a robbery. In those same two years, no weapon had been
used to harm someone, no victim had been seriously injured, and in only one
case was a victim attacked prior to the accompanying theft. Even viewing the
attack on Luis as a robbery, as we presume the jury did,[23]
the circumstances of this attack are extraordinary. The assailant opened fire
from behind at long range without making any prior demand. After missing with
the first shot, the attacker proceeded to shoot Luis four times from behind
before taking his wallet. Nothing about the previous robberies committed at the
Quarry Market put Trammell Crow on notice that a patron would be murdered as
part of a robbery on its premises. Thus, Luis’s death was not foreseeable, and
Trammell Crow did not have a duty to prevent the attack.

III.
Conclusion

            “The foreseeability
of an unreasonable risk of criminal conduct is a prerequisite to imposing a
duty of care”; otherwise, a person who controls property would be subject to a
universal duty to protect against third-party criminal conduct.[24]
As we have stated before, “[t]his is not the law”[25]:
a landowner is not the insurer of crime victims.[26]
The foreseeability requirement protects the owners
and controllers of land from liability for crimes that are so random,[27]
extraordinary,[28]
or otherwise disconnected from them[29]
that they could not reasonably be expected to foresee or prevent the crimes.[30]
Because the attack on Luis was so extraordinarily unlike any crime previously
committed at the Quarry Market, we conclude that Trammell Crow could not have
reasonably foreseen or prevented the crime and thus owed no duty in this case. Therefore,
without reaching the issue of causation, we reverse the court of appeals’
judgment and render a judgment that Respondents take nothing.

 

                                                                                    _______________________________________

                                                                                    Don
R. Willett

                                                                                    Justice

 

 

OPINION DELIVERED: August
29, 2008.














[1] Timberwalk Apartments, Partners, Inc. v. Cain,
972 S.W.2d 749, 756 (Tex. 1998) (quoting Lefmark Mgmt. Co. v. Old, 946 S.W.2d 52, 56 (Tex. 1997) (Owen, J.,
concurring)).





[2] See
Mellon Mortgage Co. v. Holder, 5 S.W.3d 654, 658 (Tex. 1999); Timberwalk,
972 S.W.2d at 756.





[3] Timberwalk, 972 S.W.2d at 756.





[4] 220 S.W.3d 33, 40, 42.





[5] Timberwalk, 972 S.W.2d at 756.





[6] Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996).





[7] Lefmark Mgmt. Co. v. Old, 946 S.W.2d 52, 53 (Tex. 1997).





[8] Timberwalk, 972 S.W.2d at 756 (quoting Walker, 924 S.W.2d
at 377).





[9]
The FBI, which created the uniform crime classification system relied on by
these crime reports, defines “simple assaults” as “all assaults which do not
involve the use of a firearm, knife, cutting instrument, or other dangerous
weapon and in which the victim did not sustain serious or aggravated injuries.”
Dep’t of Justice, Fed. Bureau of Investigation, Uniform
Crime Reporting Handbook (2004), available at http://www.fbi.gov/ucr/handbook/ucrhandbook04.pdf.

 By comparison,
the Texas Penal Code defines an assault to include “intentionally, knowingly,
or recklessly” causing bodily injury; an assault is aggravated when the victim
suffers serious bodily injury or the assailant uses or exhibits a deadly weapon
in the course of the assault. See Tex.
Penal Code §§ 22.01(a),
22.02(a).



[10] Timberwalk, 972 S.W.2d at 758.





[11] Walker, 924 S.W.2d at 377–78.





[12] See Timberwalk, 972 S.W.2d at 758.





[13] 220 S.W.3d
at 37–38 (reordered from original).





[14] Timberwalk, 972 S.W.2d at 759.





[15] Id. at 757.





[16] See id.
at 757–58.





[17] Id. at 758.





[18] 5 S.W.3d
654, 657 (Tex.
1999).





[19] Timberwalk, 972 S.W.2d at 758.





[20] Id. at 756 (quoting Walker v. Harris, 924
S.W.2d 375, 377 (Tex.
1996)).





[21] Id. at 758.





[22] See id.





[23] See City of Keller v. Wilson,
168 S.W.3d 802, 821 (Tex.
2005).





[24] Timberwalk, 972 S.W.2d at 756.





[25] Id.





[26] Mellon
Mortgage Co. v. Holder, 5 S.W.3d 654, 658 (Tex. 1999).





[27] See Timberwalk, 972 S.W.2d at 756.





[28] See Walker v. Harris, 924 S.W.2d 375,
377–78 (Tex.
1996).





[29] See
Holder, 5 S.W.3d at 658.





[30] Walker, 924 S.W.2d at 378.