

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00433-CV

JOEL STAINBROOK                                                         APPELLANT

V.

TEXAS CHRISTIAN UNIVERSITY                                      APPELLEE

----------

### FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 096-256767-11

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In two issues, Appellant Joel Stainbrook appeals the granting of TCU's no-evidence motion for summary judgment, and in a separate issue, he complains about the court assignment of the case. We affirm.

----------

[1]*See* Tex. R. App. P. 47.4.

## II.  Statement of Facts

On November 14, 2009, top-20-ranked TCU and Utah played football in Amon Carter stadium before a sold-out crowd, reportedly numbering over 50,000.  With a 6:40 p.m. kick-off, parking lots opened earlier than normal at 1:00 p.m.  The TCU Police Department and the Fort Worth Police Department (FWPD) provided security, with Contemporary Services Corporation (CSC) providing event staffing.  The two police departments furnished 113 officers, and CSC provided an additional 211 employees.  Sergeant Paul Strittmatter and Officer Chris Brashear later testified that these numbers were sufficient for the crowd and that generally there were few fights or arrests in connection with TCU games in that TCU students formed a "rather sedate crowd."  Stainbrook agreed with this assessment and later testified that he did not recall any fights at previous football games that he had attended and was not aware of any publicity of previous crimes at TCU.  Typically, when a football game ends, the officers are at their assigned lots, and bike patrol officers are typically the last ones to leave on game days, tailgating usually ending by an hour and a half after the game's end.

Two TCU fraternity alumni, Adam Brown and Jared Bradley, held a tailgate party in Lot 2 in connection with the football game.  Eleven FWPD bike patrol officers patrolled all of the parking lots, and Officer Phillip Vasquez policed Lot 2, working the entrance on foot.  Six CSC employees were also assigned to Lot 2. Incidents arose between two brothers and fellow fraternity alumni, Tim and David

O'Brien, and other members of the tailgate party. According to witness Jenny Robertson, before the game, David O'Brien tried to start a fight, which was resolved by police officers on bicycles. Witnesses described the O'Briens as "obviously . . . visibly intoxicated . . . trying to a start fight." Although tailgate parties are generally empty during the game, Stainbrook returned to the tailgate location at the end of the third quarter because TCU was winning in a "blowout," the final score being 55-28. Twenty or thirty minutes after his return, he noticed a possible second conflict between Tim O'Brien and Courtland Kilpatrick. Stainbrook, shocked that anyone was acting like that, stepped in and defused the situation. Host Jared Bradley witnessed a third conflict between Tim O'Brien and Thomas Corely about thirty minutes after the game ended at 10:10 p.m. Witnesses described the conduct of the O'Briens as "belligeren[t] and "aggressive[]," "yelling," "chest bumping and pushing," "fists clenched," and offering to fight. Bradley reported the situation, and FWPD officers arrived to assist in halting the situation. Bradley did not ask that anyone be arrested, only that the O'Brien brothers leave the tailgate party. Corporal Oscar Flores escorted the O'Brien brothers out of the parking lot and did not believe that they were overly intoxicated, else he would have arrested them. Stainbrook witnessed Officer Flores's actions and was not concerned that the O'Brien brothers would return and start a fight. Thirty to sixty minutes later, as the tailgate party was ending, the O'Brien brothers surreptitiously reentered Lot 2 and assaulted multiple tailgaters, including Stainbrook. Officers Brasheer and

3

D.J. Scott, walking through Lot 2, witnessed these fights from about fifty yards away and quickly arrived on the scene. Officer Flores and a second bike officer, just north of Lot 2, arrived at the fights within thirty seconds to a minute. The fights ended upon the officers' arrival.[2]

As a consequence of the fight, Stainbrook sustained injuries to his neck, back and leg. Because of a fractured tibia, Stainbrook required surgery to permanently place a metal rod in his leg.

As a result of the foregoing, Stainbrook filed suit against TCU, CSC, and three O'Brien brothers on May 3, 2010. Over a year later, TCU filed a no-evidence motion for summary judgment, Stainbrook nonsuited his case, and refiled it in Johnson County three days later. A motion to transfer venue back to Tarrant County was granted in November 2011, and the case was transferred back to its original Tarrant County court, the 67th District Court. In February of 2012, TCU refiled its no-evidence motion for summary judgment. The basis of the motion was that there was no evidence of a legal duty, breach of that duty, or injuries and damages proximately caused by TCU. While this motion was pending, Stainbrook filed a "Motion to Assign the Case to the Administrative Judge for Random Selection in Courts Designated for the Subject Matter of the Litigation." The 67th District Court trial court judge denied this motion and

---

[2] This factual background contains four separate incidents, but both parties to this appeal indicate that only three occurred; it may be that the second and third incidents recounted herein were related.

4

granted summary judgment in favor of TCU. Stainbrook then filed a motion to recuse that judge. The trial judge recused himself, and the regional presiding judge assigned the case to the 96th District Court. Following this transfer, TCU filed a further no-evidence motion for summary judgment as to additional claims Stainbrook had added while the original summary judgment motion was pending. In response to Stainbrook's "Motion to Reconsider TCU's [original] Motion for No Evidence Summary Judgment," the 96th District Court judge held a hearing to reconsider the prior judge's grant of summary judgment in favor of TCU as well as the latter-filed no-evidence motion for summary judgment regarding Stainbrook's later-filed claims. The 96th District Court judge made the determination that summary judgment was proper as to all of Stainbrook's claims without specifying the basis for his ruling. Stainbrook nonsuited his claims against the O'Brien brothers and does not appeal the summary judgment of his claims against CSC. He also does not appeal the summary judgment of his nuisance and misrepresentation claims. Thus, the only causes of action before us are those pertaining to TCU, which were nonsuited in September 2013.

### III. Negligence/ Premises Liability

In his first issue, Stainbrook asserts that the trial court committed reversible error by granting TCU's no-evidence summary judgment motion as to his premises liability and negligence / inadequate security causes of action because he offered evidence as to every element of the causes of action.

5

## A. Standard of Review

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not

6

proper.  *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

## B.  Inadequate Security Claims

At various places in various pleadings, Stainbrook has characterized his cause of action against TCU in various ways, including as a premises liability case, negligent security case, and negligent activity case.  Regardless of how it is characterized, "[a] complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises liability claim." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998).  "We have repeatedly treated cases involving claims of inadequate security as premises-liability cases."  *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010).  The entire focus of Stainbrook's complaint against TCU was, and is, that there was inadequate security present to protect him from the O'Briens' attack, and hence this is a premises liability case and will be analyzed as such.

> Generally, a premises owner has no duty to protect invitees from criminal acts by third parties.  We have recognized an exception when the owner knows or has reason to know of a risk of harm to invitees that is unreasonable and foreseeable.
>
> . . . .
>
> Whether a duty exists is a question of law for the court and turns "on a legal analysis balancing a number of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant."

7

*Id.*, at 767 (quoting *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 217, 218 (Tex. 2008).

We first turn to the question of duty on the part of TCU and specifically focus on the issue of foreseeability. Our Supreme Court has given us two scenarios under which a failure to provide adequate security against criminal conduct rises to the level of a premises liability claim. Those scenarios are contained in *Timberwalk* and *Del Lago*. The distinction in the scenarios between the two cases, for purposes of our analysis in this case, is the timing of events giving rise to a duty on behalf of the premises owner, that is, whether those events occurred in the past (*Timberwalk*) or contemporaneous in nature (*Del Lago*).

In *Timberwalk*, Cain alleged that "she was raped in her apartment because her landlord failed to provide adequate security." 972 S.W.2d at 751. She alleged a history of criminal events in and around her apartment complex and a corresponding lack of security provided by the complex that allowed the attack to occur. The Supreme Court discussed at length the historical criminal activity factors necessary to make such an event foreseeable for purposes of imposing a duty on the premises owner. "These factors—proximity, recency, frequency, similarity, and publicity—must be considered together in determining whether criminal conduct was foreseeable." *Id.* at 759. As to the unfortunate circumstances involving Cain, the court held that:

8

Applying the factors we have set out to the facts before us, we conclude that the risk that a tenant would be sexually assaulted was in no way foreseeable to Timberwalk. Therefore, as a matter of law, Timberwalk owed Cain no duty to provide additional security beyond that required by statute and by the lease.

*Id.*

By contrast, *Del Lago* addresses a situation in which there is not an alleged history of criminal activity but an immediacy of events leading up to criminal activity. The opinion specifically addresses whether Del Lago had a "duty to protect Smith from being assaulted by another bar customer." 307 S.W.3d. at 767. The court observed that "criminal misconduct is sometimes foreseeable because of immediately preceding conduct . . . . [T]he actor may have sufficient knowledge of the *immediate circumstances* . . . to foresee that party's misconduct." *Id.* at 769. Bradley Smith was a member of a fraternity party at the Grandstand Bar in the Del Lago resort on the shores of Lake Conroe. An hour-and-a-half long escalating and alcohol–fueled conflict occurred between the fraternity members and members of a wedding party. What began as verbal jousting became chest bumping and pushing and eventually erupted into an all-out brawl, fueled by the bar staff continuing to serve alcohol, giving no notice to resort security, and herding the parties together while attempting to close the bar. In upholding the jury verdict finding Del Lago responsible for Smith's injuries resulting from the brawl, the court observed that:

> Del Lago's duty arose not because of prior similar criminal conduct but because it was aware of an unreasonable risk of harm at the bar that very night. When a landowner "has *actual* or constructive

9

knowledge of any condition on the premises that poses an unreasonable risk of harm to invitees, he has a duty to take whatever action is reasonably prudent" to reduce or eliminate that risk.

. . . .

. . . The duty arose because the likelihood and magnitude of the risk to patrons reached the level of an unreasonable risk of harm, the risk was apparent to the property owner, and the risk arose in circumstances where the property owner had readily available opportunities to reduce it.

. . . .

. . . Del Lago's duty was to "take whatever action [was] reasonably prudent under the circumstances to reduce or to eliminate the unreasonable risk from that condition." We have alternatively described the duty as requiring the premises owner to "either adequately warn of the dangerous condition or make the condition reasonably safe.

*Id.* at 769–71. (footnotes omitted)

We first turn our attention to the *Timberwalk* factors and consider whether there was such a history of criminal activity applicable to the situation on the day of the incident as to make foreseeable the occurrence that gave rise to this lawsuit. Stainbrook lists seven "bullet points" in his brief that he alleges are applicable to this question. We have set out his list in full:

- [1] Sergeant Paul Strittmatter testified to _similar incidents_ to the present matter, "after a game," when invitees are "at the height of emotion,"

  **Q.** Have there been more problems after a game, at the height of emotion?

10

**A. Oh, there's always some taunting going on that we hear . . . I would be surprised to see that we averaged more than, you know—up until this year, *one—one arrest per game. Then there's some games there are as many as six or seven people arrested for different incidences.***"[3] **(emphasis supplied)**

- [2] Sergeant Strittmatter also testified to knowing of *prior similar assaultive incidences* when he affirmed, ***"[W]e've had other brawls, yes . . . yeah, where everybody knew each other."***

- [3] Strittmatter also testified when asked *whether pushing and shoving between rival groups or individuals happens **"a lot"** during these football games,* ***"Oh, yeah. Because you—you've got rival people walking through the parking lots to get to the stadium."*** (emphasis supplied)

- [4] Finally, Sergeant Strittmatter also testified, "[W]e've had some where there's pushing and shoving . . . whether, you know, somebody looked at somebody's girlfriend wrong or—or, you know, said something bad about TCU or another school, you know, the rival school that's there at the time."

- [5] Lieutenant Paul Jwanowski testified that due to intoxication **on average there were *"one or two" arrests per game.*** (emphasis supplied)

- [6] The "CSC Incident Report" reveals that there had already been a separate "altercation" at the ESPN Compound earlier *that very same day*. Page two of the Report also reveals that the CSC staff member "notified TCU and Fort Worth PD."

- [7] As in any sporting event, there is a well-known built-in animosity between opposing rival fans outside in the parking lot areas at college sporting events, as eluded to by Sergeant Strittmatter.

---

[3] The record states,

A. Oh, there's always some taunting going on that we hear . . . . I would be surprised to see that we averaged more than—up until this year . . . . one arrest per game. Then there's some games . . . . we may arrest six, seven people on different incidents.

We first observe that the referenced CSC incident report, item 6, was objected to in connection with Stainbrook's response to TCU's motion for summary judgment. The objection was sustained by the trial court but is not challenged in this appeal. Thus, we will not consider it on appeal. *Frazier v. Yu*, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied) ("Where evidence has been held to be inadmissible and that holding has not been challenged on appeal, this court cannot consider the excluded evidence.") Additionally, with regard to Strittmatter's comments regarding taunting in item 1, and rivals in items 3 and 7, this incident did not involve rivalry but in fact involved members of the same fraternity at TCU. Therefore, what we have as far as a history of similar criminal events is concerned is (1) a police officer saying that he would be surprised if there was more than one arrest per game on average, (2) Lieutenant Jwanowski's estimate of one to two arrests per game with a maximum of six or seven arrests in a game, and (3) an awareness that other brawls had occurred in the past. We have examined cases in which the court held that the evidence of historical criminal activity rose to the level necessary to place a duty on the premises owner. *See Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 657 (Tex. 1999) (concluding 190 violent crimes in area is evidence of foreseeability); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–50 (Tex. 1985) (holding that violent acts were foreseeable where an attempted murder, two aggravated assaults, and multiple apartment and vehicle burglaries had occurred on

premises); *Rivera v. S. Green Ltd P'Ship.*, 208 S.W.3d 12, 19–20 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding that criminal conduct was likely foreseeable based on evidence of four robberies, six aggravated assaults, and four sexual assaults that had occurred within two-tenths of a mile from premises ); *Petrie v. UDR Tex. Props., L.P.*, No. 14-13-00123-CV, 2014 WL 3955074, at *4, 9 (Tex. App.—Houston [14th Dist.] Aug. 14, 2014, no pet. h.) (mem. op.) (holding that unreasonable risk of harm was foreseeable where 220 violent crimes occurred in the vicinity, including one aggravated assault and three rapes on premises, over two year period).

In contrast, here, past criminal activity did not rise to a level that it imposed a duty on TCU. Turning to the factors enumerated in *Timberwalk*, proximity, recency, frequency, similarity, and publicity, it is readily apparent that the paucity of prior undated incidents, without evidence of publicity, does not make the criminal conduct which occurred foreseeable. *See Timberwalk*, 972 S.W.2d at 759. We hold that Stainbrook has not met his burden under *Timberwalk* to show foreseeability and hence a duty on the part of TCU with regard to this incident.

We next turn to the question of when "criminal misconduct is sometimes foreseeable because of immediately preceding conduct." *Del Lago*, 307 S.W.3d at 769. Del Lago was found responsible under the premises liability theory because the likelihood and magnitude of the risk to patrons reached the level of an unreasonable risk of harm, the risk was apparent to the property owner, and

13

the risk arose in circumstances in which the property owner had readily available opportunities to reduce it.  *Id.* at 770.

Let us then examine the events of that day to see if the *Del Lago* analysis results in a duty being placed upon TCU.  Jenny Robertson recalled that before the game started, David O'Brien tried to start a fight, which was resolved by officers from the FWPD.  Hours later, after the conclusion of the third quarter, a second and possibly a third conflict, occurred.  This incident resulted in the O'Brien brothers being escorted out of the parking lot by an officer who did not believe that they were overly intoxicated or he would have arrested them. Stainbrook testified that he was not concerned at that point that the O'Brien brothers would return and start a fight.  An hour or less later, the final altercation occurred, which was quickly stopped by both Officer Brasheer and Scott and two bike officers who arrived at the scene in less than one minute.  Comparing the facts of this case to those of *Del Lago* is comparing a Chihuahua to a Great Dane.

In *Del Lago*, there was a continuous disturbance between two factions over an hour and a half period, which escalated in intensity over that time and was exacerbated by the continuous serving of alcohol by Del Lago's employees. In addition, these employees failed to notify security when it obviously was called for and finally brought the matter to a head by forcing the parties physically together when telling them to exit at closing time.  *See West v. SMG*, 318 S.W.3d 430, 442 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that evidence of

14

bottles being thrown into crowd by band prior to a bottle striking West did not give actual and direct knowledge of imminent assault under *Del Lago*). We hold that the activity prior to the incident giving rise to this lawsuit had not "reached the level of an unreasonable risk of harm," the risk was not "apparent to the property owner," and the risk did not arise "in circumstances where the property owner had readily available opportunities to reduce it." TCU therefore had no duty to protect Stainbrook under *Del Lago*. Stainbrook's first issue is overruled.

## IV. The Assigned Court

In his second issue, Stainbrook asserts that the trial court committed reversible error by denying his motion to have this case randomly assigned because Tarrant County Local Rule 1.03 dictates that transfer cases shall be filed by random selection and not to a specific Tarrant County court.

While this is a somewhat unique situation, in that the case had already been randomly assigned to a Tarrant County court, and nonsuited, refiled in another county, then transferred back from that county, we will assume that the case should have been randomly assigned rather than being reassigned to its original court. Stainbrook however fails to point us to harm that resulted from this error, if any. Nor can we envision what the harm might have been. Under the present local custom, to avoid court-shopping, if a case is assigned to a court and then nonsuited and refiled, it is assigned to its original court upon refiling. Were we to accept the harmful error analysis as Stainbrook alleges, this policy

15

would be circumvented, potentially allowing forum shopping. Stainbrook's second issue is overruled.

## V. Conclusion

Having overruled both of Stainbrook's issues, we affirm the judgment of the trial court.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED: November 6, 2014