

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00297-CV

KAREN "SUE" BURNETT,
INDIVIDUALLY, AND ON BEHALF
OF THE ESTATE OF JERRY
EDWIN BURNETT, DECEASED

APPELLANT
AND APPELLEE

V.

CHRISTINA T. VO, HOANG
THANH, INC. D/B/A C&D KWIK
STOP AND/OR CD KWIKSTOP

APPELLEES
AND APPELLANTS

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 141-258307-12

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant and Appellee Karen "Sue" Burnett, individually, and on behalf of

the estate of Jerry Edwin Burnett, deceased, appeals from a judgment entered

---

[1]*See* Tex. R. App. P. 47.4.

on a jury verdict awarding her damages against Appellees and Appellants Christina T. Vo, Hoang Thanh, Inc. d/b/a C&D Kwik Stop and/or CD Kwikstop. In five issues, Karen complains primarily about the trial court's determination that five responsible third parties were negligent per se as a matter of law. Appellees challenge the legal sufficiency of the evidence to support Karen's premises-liability claim. As to Karen's appeal, we will reverse and remand. As to Appellees' appeal, we will affirm.

## II. BACKGROUND

Owned in part by Vo, CD Kwikstop is a convenience store that also cashes checks. Moncomp Auto, a car lot, is located next door to CD Kwikstop.

Back in 2010, Chance Smith, Kwame Rockwell, and Randy Seibel worked at Moncomp. They visited CD Kwikstop on a regular basis and used its check-cashing service. According to Smith, there was never a time when CD Kwikstop was unable to cash one of his checks—it once cashed a check for him as large as $5,000 and for Siebel worth between $5,000 and $7,000—and Smith observed the store cashing large checks for other people. When cashing a check, Smith never saw the employee take money from a safe; the money either came from the cash register or from the back of the store. On one occasion, Siebel was allowed to accompany an employee to the back of the store to cash a check. Siebel reported seeing "stacks of money on a shelf," and by the way he described it, there appeared to be "hundreds of thousands of dollars" there.

2

At some point in late February or early March 2010, Smith, Rockwell, Seibel, and Tyrone and Tim Thomas (collectively, the RTPs) decided to rob CD Kwikstop. The struggling economy had hit Moncomp's auto business "real hard," and bills were piling up. Having observed "how much money . . . was flowing through" the store, the RTPs thought that if they robbed it, they could get "north of $100,000."

The RTPs initially planned to rob Vo's husband as he drove from the bank to CD Kwikstop on a Friday. The store cashed a lot of checks on Fridays, and the RTPs thought that Vo's husband would be transferring a substantial amount of cash from the bank to the store for that purpose. The RTPs found where the Vos lived and followed Vo's husband in two cars, but they lost track of him, and the plan fell through.

The RTPs then thought that the Vos were storing large amounts of cash at their house. They figured that if they burned down the Vos' house, the Vos would instead store the cash at CD Kwikstop. Rockwell used a "home-concocted napalm" to burn the house.[2] Afterwards, he thought that the Vos had transferred cash from the house to CD Kwikstop; therefore, the plan returned to robbing CD Kwikstop.

---

[2]The record is unclear about the extent of the damage to the house.

The RTPs planned to commit the robbery at 6:00 a.m., when the police changed shifts and fewer customers were in the store. After two aborted attempts, they proceeded with the robbery early in the morning on March 23, 2010. Smith and Tim acted as lookouts, and the other three RTPs entered the store and immediately confronted and shot Jerry Burnett, a bread deliveryman who was inside stocking shelves. The store clerk then led the RTPs to a box of frozen turkey legs that was in a freezer at the back of the store. The box contained approximately $3,000 in cash and $18,000 in checks, which the RTPs took before shooting and killing the clerk. They attempted to burn the store down to destroy the surveillance cameras but were unable to ignite a fire.

Jerry died in the hospital ten days later. Rockwell, Seibel, and Tyrone were convicted of capital murder, and Smith pleaded guilty to aggravated robbery with a deadly weapon.[3] During the investigation, Vo told authorities that CD Kwikstop had a drop safe but that the store had quit using it after a burglary and instead hid the store's cash and checks in a box of frozen turkey legs located at the back of the store.

Karen sued Appellees to recover damages for Jerry's death, alleging that Appellees were liable under a negligence theory of premises liability. She averred in part that the incident involving Jerry was reasonably foreseeable,

---

[3]Seibel and Tyrone were sentenced to life in prison. Rockwell was sentenced to death. There is no evidence that Tim was convicted of an offense arising out of the robbery.

4

"[g]iven the violent crime[s] that had occurred [at CD Kwikstop] . . . , coupled with the fact that the Defendants were inept and woefully inadequate in properly addressing the risk of the robbery" at the store. Appellees generally denied Karen's allegations, pleaded several defenses, and moved for leave to designate the RTPs as responsible third parties, which the trial court granted.

At the ensuing jury trial, the trial court denied Appellees' motions for a directed verdict on the proximate cause element of Karen's premises-liability claim; denied Karen's motion for a directed verdict that the RTPs were not negligent; but—figuring that the RTPs were negligent per se—directed a verdict, on its own motion, against the RTPs for negligence. The trial court explained the reason for its latter ruling as follows:

The Court: They murdered the guy. They violated a statute.

[Plaintiffs' attorney]: Okay.

The Court: So they're negligent per se.

The jury charge collectively identified the RTPs as "Co-Conspirators" and instructed the jury that "[t]he Court has determined that the Co-Conspirators are Negligent as a matter of law." The jury found Appellees negligent under a premises-liability theory but not a negligent-activity theory, apportioned 3% of the responsibility for the occurrence to Appellees and 97% of the responsibility to the RTPs, and awarded Jerry's estate damages in the amount of $111,716.64 and Karen damages in the amount of $160,000. Incorporating the jury's apportionment findings, the trial court, on June 17, 2014, signed a final judgment

5

that reduced the jury's awards by 97%, assessing judgment against Appellees for $3,602.84 in favor of Jerry's estate and for $5,070.00 in favor of Karen.

### III. FAIR NOTICE AND TRIAL BY CONSENT—NEGLIGENCE PER SE

We construe Karen's second issue to argue that the trial court erred by directing a verdict that the RTPs were negligent because neither Appellees' pleadings nor the evidence at trial gave her fair notice that Appellees were relying on the theory of negligence per se. Appellees respond that its pleadings gave Karen fair notice of their reliance on negligence per se and that the issue was tried by consent. We agree with Karen.

A judgment must be supported by the pleadings, and a party may not be granted relief in the absence of pleadings to support such relief. Tex. R. Civ. P. 301. Texas follows a fair-notice standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). The purpose of the rule is to give the opposing party information sufficient to enable him to prepare a defense. *Id.* at 897. A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. *Id.* A court should liberally construe a petition in favor of the pleader if no special exceptions are filed. *Id.*

Negligence per se is not a separate cause of action that exists independently of a common-law negligence claim. *Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). It is a

doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims. *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997). A "party seeking to recover on the ground of negligence per se must plead a statutory violation." *Daugherty v. S. Pac. Transp. Co.*, 772 S.W.2d 81, 83 (Tex. 1989). A pleading of general negligence alone ordinarily will not give an opposing party fair notice of a specific statutory violation. *See Murray v. O&A Express, Inc.*, 630 S.W.2d 633, 636 (Tex. 1982) (reasoning that "a party relying upon a statutory violation should plead this reliance if he is to recover on that basis" because the defendant "must frame his defense in terms of the recognized excuses for the violation of a statute"); *LaGrone v. Sendero Energy, Inc.*, No. 06-06-00085-CV, 2007 WL 2332329, at *4 (Tex. App.—Texarkana Aug. 17, 2007, no pet.) (mem. op.).

Liberally construing Appellees' pleadings, Appellees did not specifically plead the violation of any particular statute or generally plead negligence per se, nor do their pleadings contain any other allegations sufficient to give Karen fair and adequate notice that the RTPs were negligent per se. Appellees direct us to their allegations that the incident was caused by the "negligent and/or intentional acts or omissions of some third person or persons" and that the "criminal conduct was the sole proximate cause of the incident in question," but general allegations involving intentional criminal conduct do not necessarily implicate the violation of a statutory standard of conduct, including capital murder. Appellees' motion for

7

leave to designate responsible third parties was no different; they sought leave to designate the RTPs as responsible third parties because they "planned and carried out the armed robbery of Defendants' store" and "shot and killed the store clerk and mortally wounded Jerry Edwin Burnett." The pleading gave Karen fair notice of the basis for the requested leave but not fair notice that the RTPs were negligent per se for violating the capital-murder statute, or any other statute for that matter.

Alternatively, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex. R. Civ. P. 67. The rule of trial by consent is limited to those exceptional cases where the parties clearly tried an unpleaded issue by consent. *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 18 (Tex. App.—El Paso 2005, pet. denied). To determine whether the issue was tried by consent, the court must examine the record not for *evidence* of the issue, but rather for evidence of *trial* of the issue. *Id.*

The record demonstrates that the first person to utter the words "negligent per se" was the trial judge, and he did so only at the conclusion of the trial, when he was entertaining directed-verdict motions. Having reviewed the entire record, it plainly appears that neither side had anticipated the trial court's sua sponte determination that the RTPs were negligent per se. More importantly, however, there was no testimony or other evidence indicating that the parties actually tried the issue of whether the RTPs violated a statutory standard of conduct—

8

specifically, the capital-murder statute—and were thus negligent per se. Appellees offered, and the trial court admitted, the judgments of conviction for Rockwell, Smith, Seibel, and Tyrone, but if anything, that amounted to no more than mere evidence of the convictions. Appellees did not seek to amend their pleadings during trial to allege negligence per se.

Because negligence per se was neither pleaded nor tried by consent, the trial court erred by directing a verdict that the RTPs were negligent. Accordingly, we sustain Karen's second issue and do not reach her first, third, and fourth issues, which raise other arguments challenging the trial court's negligence per se determination.[4] *See* Tex. R. App. P. 47.1.

## IV. CONFLICTING JUDGMENTS

The trial court signed a final judgment on May 30, 2014, that did not reduce the jury's awards by 97%. On June 17, 2014, the trial court signed a final judgment that applied the jury's apportionment findings to the jury's awards. In her fifth issue, Karen argues that the May 30, 2014 final judgment "may be the sole, legally-cognizable final judgment in this case" because the June 17, 2014 final judgment "contains no statement that is meant to supersede the May Judgment or that the trial court vacated or withdrew the May Judgment." She

---

[4]Karen's first issue states, "Did the trial court err by finding that the intentional act of murder constitutes negligence per se when no court in Texas has ever made such a finding?" Our decision to address Karen's second issue, and therefore resolve the matter on procedural grounds, should not be construed as any indication that her first issue is unpersuasive.

9

"requests that the current appellate proceedings which are directed to the June 17, 2014 instrument be summarily concluded by memorandum opinion with a declaration that the June 17, 2014 instrument is a nullity and that [Karen] is free to execute on the May 30, 2014 Final Judgment."

Any change in a judgment made during the trial court's plenary power is treated as a modified or reformed judgment that implicitly vacates and supersedes the prior judgment, unless the record indicates a contrary intent. *SLT Dealer Grp., Ltd. v. AmeriCredit Fin. Servs., Inc.*, 336 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Owens-Corning Fiberglas Corp. v. Wasiak*, 883 S.W.2d 402, 410–11 (Tex. App.—Austin 1994, no writ).

The trial court signed the June 17, 2014 judgment during its plenary power, *see* Tex. R. Civ. P. 329b(d), and nothing in the record indicates that it did not intend the June 17, 2014 judgment to vacate and supersede the May 30, 2014 judgment. In fact, the record demonstrates just the opposite; not only does the June 17, 2014 final judgment apply the jury's apportionment findings, the trial court later signed an order—after Appellees had timely filed a motion for new trial from the May 30, 2014 order—clarifying that the June 17, 2014 judgment superseded the May 30, 2014 judgment. We overrule Karen's fifth issue.

## V. LEGAL SUFFICIENCY—PROXIMATE CAUSE

In their two issues, Appellees argue that there was legally insufficient evidence of both components of proximate cause.

10

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

A complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises-liability claim. *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998). Premises liability is a special form of negligence in which the duty owed to the plaintiff depends upon the status of the plaintiff when the incident occurred. *W. Inv., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). When the injured party is an invitee, as in this case, the elements of a premises-liability claim are actual or constructive knowledge of a condition on the premises by the owner, the condition's posing an

11

unreasonable risk of harm, the owner's failure to exercise reasonable care to reduce or eliminate the risk, and proximate causation from that failure to the plaintiff's injury. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000). The proximate-cause element has two components: cause-in-fact and foreseeability. *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006).

## A.    Foreseeability

Generally, a premises owner has no duty to protect invitees from the criminal acts of third parties. *Timberwalk*, 972 S.W.2d at 756. An exception exists when the owner knows or has reason to know of a risk of harm to invitees that is both unreasonable and foreseeable. *Id.* Appellees specifically challenge the foreseeability component as it pertains to proximate cause instead of duty, but the foreseeability analysis is the same for both duty and proximate cause. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010); *see also Perez v. DNT Glob. Star, L.L.C.*, 339 S.W.3d 692, 702 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

### 1.    *Timberwalk* Factors

One framework for proving foreseeability involves an application of the *Timberwalk* factors. In *Timberwalk*, the supreme court identified five factors that "guide courts in situations where the premises owner has no direct knowledge that criminal conduct is imminent, but the owner may nevertheless have a duty to protect invitees because past criminal conduct made similar conduct in the future foreseeable." *Del Lago*, 307 S.W.3d at 768; *see Timberwalk*, 972 S.W.2d at

12

757–58. These factors include (1) proximity—whether any criminal conduct previously occurred on or near the property; (2) recency—how recently such conduct occurred; (3) frequency—how often such conduct occurred; (4) similarity—how similar the prior conduct was to the conduct that occurred on the property; and (5) publicity—whether any publicity surrounded the occurrences to indicate that the property owner knew or should have known about them. *Timberwalk*, 972 S.W.2d at 757–58.

Merlyn Moore, Ph.D. was Karen's testifying expert. He explained that his role was to review documents and offer an opinion about whether the security policies and procedures used at CD Kwikstop were or were not adequate and whether the incident on March 23, 2010, was reasonably foreseeable. As part of a risk assessment that he performed, Dr. Moore considered the following five violent crimes:

- On May 29, 2008, a person was shot and found dead in CD Kwikstop's parking lot.

- On May 23, 2009, a person was robbed at gunpoint at the gas pumps in front of CD Kwikstop.

- On August 25, 2009, a juvenile committed a robbery at CD Kwikstop.

- On December 9, 2009, a person was "jumped" and beaten behind CD Kwikstop and had $20 taken from him.

- In 2005 or 2006, Vo's sister-in-law was robbed and shot while working at CD Kwikstop.

13

Based on these five incidents, and considering the *Timberwalk* factors, Dr. Moore opined that it was reasonably foreseeable that a robbery could occur at CD Kwikstop. We examine the same factors in this evidentiary-sufficiency review.

Regarding proximity, all five of the crimes occurred on the property. Contrary to Appellees' argument, this factor does not weigh against a showing of foreseeability simply because several of the crimes occurred outside of the store instead of inside of the store; the inquiry is whether "other crimes have occurred *on the property* or in its immediate vicinity." *Id.* at 757 (emphasis added).

Regarding recency and frequency, three of the crimes occurred the previous year, one occurred in 2008, and one occurred in 2005 or 2006. "A criminal act is more likely foreseeable if numerous crimes are concentrated within a short time span than if few prior crimes are diffused across a long time span." *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 15 (Tex. 2008). The 2005 or 2006 robbery is temporally remote when considered in isolation, but its relevance to the inquiry is strengthened substantially when we consider that four other violent crimes occurred between 2006 and 2010, including three in the year immediately preceding the incident at CD Kwikstop. Under these circumstances, it is reasonable to consider the 2005 or 2006 robbery.

As for similarity, the previous crimes must be sufficiently similar—but not identical—to the crime in question as to place the landowner on notice of the specific danger. *Timberwalk*, 972 S.W.2d at 758. For example, "[a] string of assaults and robberies in an apartment complex make the risk of other *violent*

14

*crimes*, like murder and rape, foreseeable." *Id.* (emphasis added). Here, each of the five previous crimes that Dr. Moore relied upon were violent. Moreover, three were robberies, and in another, a person was beaten and had $20 taken from him. Thus, like the incident in this case, money appeared to be the motivating factor in those crimes. Moreover, three of the five previous offenses involved a firearm, and in two of them, the complainant was shot.[5]

Regarding publicity, as Dr. Moore testified, Mrs. Vo is the owner and manager of CD Kwikstop. "[S]he certainly had knowledge of the crimes that were occurring there or should have had knowledge of [them]."

Utilizing a *Timberwalk* analysis, Karen presented some evidence from which the jury could have reasonably concluded that it was foreseeable that a robbery could occur at CD Kwikstop.

---

[5]In arguing that the similarity factor weighs against foreseeability, Appellees direct us to two decisions in which the appellate courts concluded that a robbery at a business was not foreseeable. *See Park v. Exxon Mobil Corp.*, 429 S.W.3d 142, 148 (Tex. App.—Dallas 2014, pet. denied); *Viera v. Little Caesar Enters., Inc.*, No. 01-10-00863-CV, 2011 WL 6306653, at *6 (Tex. App.—Houston [1st Dist.] Dec. 15, 2011, no pet.) (mem. op.). Both cases are distinguishable on their facts. In *Park*, none of the prior crimes involved shootings. 429 S.W.3d at 148. The previous crimes in this case involved shootings. In *Viera*, there was evidence of only one "significantly similar" prior crime. 2011 WL 6306653, at *6. This case involves evidence of at least three "sufficiently similar" crimes, the standard used by the supreme court, not the courts of appeals. *See Timberwalk*, 972 S.W.2d at 758; *see also id.* at 756 ("Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable.").

15

## 2. Character of Premises

We reach the same result using a different framework. In addition to the *Timberwalk* factors, "[t]he nature and character of the premises can be a factor that makes criminal activity more foreseeable." *Del Lago*, 307 S.W.3d at 768. "[W]hen a property owner 'by reason of location, *mode of doing business*, or observation or past experience, should reasonably anticipate criminal conduct on the part of third persons, . . . [the owner] has a duty to take precautions against it.'" *Id.* at 769 (emphasis added).

CD Kwikstop is a convenience store that also cashes checks. According to Dr. Moore, the odds of a convenience store being robbed increase when the store also cashes checks. On top of this, the evidence showed that CD Kwikstop regularly kept large amounts of cash on the premises but exercised sloppy cash-handling procedures that were contrary to industry standards. Indeed, among other things, (i) the store quit using a drop safe and instead hid cash and checks in a turkey box in the back of the store, (ii) it did not post signs stating that the clerks cannot access the safe, and (iii) when cashing checks, clerks routinely went to the back of the store to collect cash when there was a shortage of cash up front. Dr. Moore testified (i) that he had never seen a convenience store that handled money like CD Kwikstop did; (ii) that it "was just abominable" if the store exercised poor cash-handling procedures and potential criminals perceived that the store kept large amounts of cash on hand; and (iii) that CD Kwikstop was an "attractive target" because of the perception that there were large amounts of

16

unsecured cash on hand.  All of this is evidence that robbery was a foreseeable event at CD Kwikstop.  *See San Antonio & A.P. Ry. Co. v. Behne*, 231 S.W. 354, 356 (Tex. 1921) (discussing proximate cause and observing that "our Supreme Court has uniformly applied what might be termed a practical, *common sense* test, the test of common experience." (emphasis added)).

**B.    Cause in Fact**

Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which the injury would not have occurred. *City of Gladewater v. Pike*, 727 S.W.2d 514, 517 (Tex. 1987).

Appellees' theory at trial was that the RTPs were going to commit the robbery no matter what—whether CD Kwikstop exercised poor cash-handling procedures or not.  They continue with this argument on appeal, pointing to the various plans that the RTPs concocted and contending that "the crime at issue in this case was going to take place regardless of any action or inaction on the part [of] cross-appellants or anyone else."  The jury, however, ultimately chose to reject Appellees' theory and to believe Karen's theory of the case—that CD Kwikstop's sloppy cash-handling procedures was a substantial factor in bringing about the robbery and untimely death of Jerry.  *See City of Keller*, 168 S.W.3d at 819–20 (reasoning that jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony and are responsible for resolving conflicts in the evidence).

Indeed, Dr. Moore testified that the store's poor cash-handling procedures was a proximate cause of Jerry's death. More specifically, he opined,

> Again, as we know from the testimony, they [the RTPs] were there about every day. We know also that they observed poor cash handling procedures or I believe the term they used, sloppy cash handling procedures.
>
> And based on those sloppy cash handling procedures and believing there was large sums of money, . . . I think that is why they robbed the store.

He reasoned,

> Had there been proper cash handling procedures, I don't think that that seed would have been planted in their minds, to, hey, we need large sums of money to kind of resurrect our car business and, boy, this store has all this money that's unsecured, and that is why they did it.

Smith's deposition testimony was even more telling. He testified,

> Q.  Okay.  What we do know is that if this place didn't have lots of money or used a safe, you would have never even chose[n] it to be a target of a robbery?
>
> A.  Correct.

According to Smith,

> Q.  In terms of the money handling there, . . . have you ever seen any type of Brinks vehicle or any type of armored car ever get any of the money?
>
> A.  No.
>
> Q.  Did y'all consider this to be basically like a bank but without the security?
>
> A.  Yes.

Q. Why didn't y'all rob the -- there were other businesses in the area, correct?

A. Right.

Q. Why didn't y'all go after the pawnshop?

A. Didn't seem as easy.

. . . .

Q. How would you characterize this CD Kwik Stop as compared to other targets?

A. Just easy target.

Q. And why do you say that?

A. I mean, . . . they were kind of careless in the way that they handled their money. You know, . . . I mean, a little too trusting with their money, I guess. It was just all out in the open.

Karen thus presented evidence from which the jury could reasonably have concluded that CD Kwikstop's poor cash-handling procedures and lack of adequate security measures were a substantial factor in bringing about the robbery and the death of Jerry.[6] We overrule Appellees' issues.

---

[6]Appellees' brief contains several statements that appear to challenge the legal sufficiency of the evidence to show that Appellees breached a duty owed to Karen. If Appellees so argue, the evidence is legally sufficient to support that element of Karen's premises liability claim; as explained, Karen presented evidence that Appellees were negligent in their handling of cash—by storing it in a turkey box, not using a safe, and transferring it to the front of the store in view of waiting customers.

## VI. CONCLUSION

The evidence was legally sufficient to support the jury's premise-liability finding against Appellees, but the trial court erred by directing a verdict that the RTPs were negligent. Accordingly, we reverse the trial court's judgment and remand this cause to the trial court for further proceedings. *See* Tex. R. App. P. 43.2(d).

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED: August 28, 2015