

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-24-00375-CV

---

Recreational Land Sales, LLC/James M. Allen, Charles Cedars,
and Deborah Cedars, Appellants/Cross-Appellees

v.

James M. Allen, Charles Cedars,
and Deborah Cedars/Recreational Land Sales, LLC, Appellees/Cross-Appellants

---

On Appeal from the 33rd District Court
Burnet County, Texas
Trial Court No. 53196

---

## MEMORANDUM OPINION[1]

This double appeal concerns Appellant/Cross-Appellee's development of a subdivision of

17 lots adjacent to Appellees/Cross-Appellants' land in Burnet County, Texas. After

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Third Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

Appellees/Cross-Appellants initiated suit, the jury found Appellant/Cross-Appellee liable for negligent nuisance and awarded Appellees/Cross-Appellants damages for annoyance, loss of enjoyment, and discomfiture. For the reasons that follow, we reverse and render.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The defendant below and original Appellant here, is Recreational Land Sales, LLC (RLS). James M. Allen, Charles Cedars, and Deborah Cedars (collectively, the Neighbors), are the plaintiffs below and Appellees/Cross-Appellants here. In May 2021, RLS purchased a 1,472-acre tract of land now known as Cross Timber Ranch. RLS later subdivided 107 of those acres into 17 lots ranging from about five to eight acres each. These 17 lots are the crux of this appeal.

The deed provided that the 107 acres are subject to restrictive covenants of the subdivision, Blacksmith Ranch. The "Blacksmith Ranch Declaration of Covenants, Conditions, and Restrictions" (the restrictive covenants), executed in 2004, governs the 107 acres and states that "[n]o lot may be resubdivided without the written approval of the Declarant or the [Architectural Control Committee]" (ACC). "Declarant" was identified as four individuals. Because Blacksmith Ranch is an exempt, unplatted subdivision, no recorded map or plat existed, and the 107 acres were described only by metes and bounds. RLS did not know where Blacksmith Ranch was located until it hired a surveyor. RLS manager Richard Grandy testified he discovered no ACC or Home Owners Association (HOA) had ever been formed and that Blacksmith Ranch had been operating without one since 2004. RLS attempted to contact the four declarants but located only one, and after speaking with him, it was confirmed that there was no ACC or HOA and there had been "inactivity in [the] subdivision regarding any kind of enforcement or anything." Through a private investigator, RLS learned that two declarants were deceased. RLS eventually determined there had been inactivity in enforcing the restrictive covenants.

2

In October 2021, RLS applied to Burnet County for a subdivision plat of Cross Timber Ranch to divide the 107 acres into 17 lots, and Burnet County approved the plat. RLS then sold all the lots to third-party purchasers. RLS also installed a gate at the entrance of Cross Timber Ranch, powerlines, and a road running through the Cross Timber Ranch subdivision.

The Neighbors own land adjacent to the 17 lots. Charles and Deborah Cedars are a married couple who own 30 acres and built what Charles described as their "forever home" on their land. They were living out their retirement. Charles engaged in many projects on their land—building their home, a barn, a chicken and rabbit pen, and a pond—and Deborah gardened. Brandon Allen owns 60 acres and testified that he planned to move to his land and build a home there with his wife after she retired. Allen specifically planned to build his home facing east to enjoy the Texas sunrise. He had spent the last 20 years fishing, hunting, and working his land, and tending to his Longhorn cattle. The below map illustrates the respective locations of Blacksmith Ranch, the 17 lots, and the Neighbors' land.[2]



---

[2] This demonstrative map, Defendant's Exhibit 1, was prepared for trial and was admitted without objection at trial and shown to the jury.

On January 24, 2022, Allen filed suit against RLS for breach of contract, fraud, and injunctive relief. The Cedars later joined the suit as plaintiffs. Together, the Neighbors asserted claims for breach of restrictive covenants, intentional nuisance, and negligent nuisance against RLS. Their pleadings alleged that they "had hoped to retain the rural character of their community" and that RLS breached the restrictive covenants by not obtaining approval of "the other property owners in Blacksmith Ranch . . . despite having notice of the express restrictions and the manner of compliance." They further alleged that "RLS's subsequent development and marketing of the property has included building roads, gates, installing powerlines, clearing of trees, digging wells, hosting open houses, and other activities" that caused "increased and unreasonable offensive noise and light, trespass onto their property by third-parties, congestion of the single lane road in and out of the property, dust, increased hazard to person and property, impairment of the comfortable enjoyment of their real property, lessening of the enjoyment of their real property, inability to hunt on the land, personal discomfort, and other unreasonable and offensive intrusions." According to the Neighbors, "future development will, in all reasonable probability, occur[, including] the building of homes, other infrastructure, and a cell phone tower on Lot 48—upon information and belief still owned by RLS. Such activities will, in all reasonable probability, continue and continue to cause substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property and cause Plaintiffs unreasonable discomfort and annoyance."

The Neighbors alleged that RLS breached the restrictive covenants by subdividing the land into the 17 lots, that RLS's knowing breach of the restrictive covenants constituted intentional nuisance, and that RLS's failure to exercise reasonable care by way of their breach of the restrictive covenants constituted negligent nuisance and substantially interfered with their use and enjoyment of their land. They sought damages for "increased and unreasonable offensive noise and light, invasion of privacy, congestion of the single lane road in and out of the property, dust, increased

4

hazard to person and property, impairment of the comfortable enjoyment of their real property, lessening of the enjoyment of their real property, annoyance and discomfiture, mental anguish, damage to the intrinsic value of the property, apprehension of danger to person or property, and other unreasonable and offensive intrusions."

At trial, testimony established that the 17 lots remained undeveloped and that construction of the gate, the road inside Cross Timber Ranch, and the powerlines, had been completed. Photos of the gate, the road, and the lots were admitted. Grandy testified about RLS's purchase of the 1,472 acres and its process for subdividing the 17 lots. Herb Darling, Development Services Director of Burnet County, and Brewer, the engineer who platted the 17 lots, both testified to the plat approval process. Allen testified about his future retirement plans, the importance of the restrictive covenants to his decision to purchase his land, and the activities he engaged in on his land. He also testified about his diminished "enthusiasm" and mental health since learning about the 17 lots, but acknowledged that although he did not know what the future owners would do with their land, he was still able to engage in the same activities on his land. The Cedars also testified. Charles described the improvements he made on his land and explained how the construction of the gate and road caused dust, cedar mulch he was allergic to, and noise. Both Charles and Deborah testified that the thought of having 17 neighbors had affected Deborah's mental health and had decreased her motivation to garden. Charles stated he was not prevented from completing his projects or hunting, that Deborah "definitely could" still garden, and that wildlife still roamed their property. The Neighbors presented no evidence of economic damages, and the trial court granted their motion in limine prohibiting any evidence of fair market value.

After the Neighbors rested, RLS moved for directed verdict. The trial court granted RLS's motion as to the breach of a restrictive covenant claim and dismissed that claim. As to RLS's

5

contention that the claimed nuisance was temporary, the trial court disagreed and held the nuisance was permanent.

RLS called other Blacksmith Ranch owners, one of whom testified that the "whole area"—not just the 17 lots—was being developed "more so than ever before." Private investigator Kenton Stephans testified about the undeveloped condition of the 17 lots and confirmed that two declarants had died. RLS also called Grandy, who testified that he did not intend to harm the Neighbors through the subdivision and had expended reasonable resources—including searching county records and hiring attorneys, engineers, and a surveyor—before subdividing the 17 lots. Before RLS sought approval from the county to subdivide the 17 lots, it held two community meetings, and Grandy testified they did not hear from the Blacksmith Ranch owners. He also explained that all of Cross Timber Ranch, including the 17 lots, is a "grazing association" requiring each lot to be at least five acres and limiting owners to building structures on only one acre to allow cattle to roam freely across the association.

During closing, counsel for the Neighbors—for the first time—introduced a "damage model" for past and future damages for each of the Neighbors. RLS objected that the dollar amounts were not tied to any evidence presented in trial. The trial court overruled RLS's objection and allowed the Neighbors' counsel to proceed. Questions of intentional nuisance and negligent nuisance were submitted to the jury. The jury found no liability on the intentional nuisance claim. It found RLS liable for negligent nuisance and awarded the following:

- Allen: $20,000 for annoyance, loss of enjoyment and discomfiture sustained in the past, and $175,000 for annoyance, loss of enjoyment and discomfiture that, in reasonable probability, he will sustain in the future.

- Deborah: $22,500 for annoyance, loss of enjoyment and discomfiture sustained in the past, and $175,000 for annoyance, loss of enjoyment and discomfiture that, in reasonable probability, she will sustain in the future.

- Charles: $22,500 for annoyance, loss of enjoyment and discomfiture sustained in the past, and $175,000 for annoyance, loss of enjoyment and discomfiture that, in reasonable probability, he will sustain in the future.

The trial court rendered its final judgment consistent with the jury's verdict. This double appeal followed.

## II. RLS'S APPEAL

RLS asserts five issues on appeal. In Issue One, RLS challenges the legal sufficiency of the evidence to support the judgment that a condition substantially interfered with the Neighbors' use and enjoyment of their land and that any alleged harm was objectively unreasonable. In Issue Two, RLS argues that because the Neighbors do not have any concrete injuries, they lacked standing and their claims were not ripe for review. In Issue Three, RLS asserts that the Neighbors presented no evidence of a legal duty because their claim for negligent nuisance sounded only in breach of contract. In Issues Four and Five, RLS challenges the damages awarded to the Neighbors. Our initial inquiry is Issue Two—whether the Neighbors' claims are ripe for this Court's review.

### A. Standard of review and applicable law

Subject matter jurisdiction is an issue that may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993); *see also Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011) (recognizing same). "Ripeness is an element of subject matter jurisdiction." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). "The ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew*, 964 S.W.2d at 928. It "is a threshold

issue that . . . emphasizes the need for a concrete injury for a justiciable claim to be presented." *Robinson*, 353 S.W.3d at 755 (citing *Patterson v. Planned Parenthood of Hous. & Se. Tex*., 971 S.W.2d 439, 442 (Tex. 1998)). We review whether a claim is ripe for review de novo. *Robinson*, 353 S.W.3d at 755.

In evaluating ripeness, a court must consider "whether, at the time a lawsuit is filed, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Mayhew*, 964 S.W.2d at 928 (citing *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex. 2000) (emphasis in original)). "A case is not ripe when its resolution depends upon contingent or hypothetical facts or upon events that have not yet come to pass." *Patterson v. Planned Parenthood of Hous. & Se. Tex*., 971 S.W.2d 439, 442 (Tex. 1998).

A nuisance is a "condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Crosstex N. Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 593 (Tex. 2016) (citing *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003)). Nuisance is a legal injury; it does not refer to a "cause of action or to a defendant's conduct but to the legal injury that the conduct causes and that gives rise to the cause of action." *Id*. at 604. "A legal injury, however, is neither the breach of a duty that gives rise to liability for the legal injury nor the damages that may be awarded as compensation for the legal injury." *Id*. at 594.

The Texas Supreme Court recognizes that a nuisance "could involve interference with numerous different interests through both physical substances and intangible conditions, such as 'water, stones, rubbish, filth, smoke, dust, odors, gases, noises, vibrations, and the like.'" *Id*. at 592. But an interference is "a nuisance—and thus as a legal injury—only if the interference is 'substantial' and causes 'discomfort or annoyance' that is unreasonable." *Id*. at 595. By requiring that an interference be substantial, the Court set "a minimum threshold that confirms that the law

8

'does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result.'" *Id*. (citing Prosser and Keeton § 88, at 626). Determining whether an interference is substantial or merely a "trifle" or "petty annoyance" depends on the circumstances, "including, for example, the nature and extent of the interference, and how long the interference lasts or how often it recurs." *Id*. at 595–96. The condition "may interfere with a wide variety of the plaintiffs' interests in the use and enjoyment of their property [, including] physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property." *Id*. at 596.

An interference must not only be substantial; to constitute a nuisance, "a plaintiff must establish that the effects of the substantial interference on the plaintiff are unreasonable." *Id*. at 597. To show unreasonableness, a plaintiff "must prove only that the effects of the interference (the plaintiff's 'discomfort or annoyance') are unreasonable, not that the defendant's conduct or land use was unreasonable." *Id*. at 599. Courts employ an objective standard for determining whether the effects of the interference are unreasonable—"the effects of the defendant's conduct or land use must be such as would disturb and annoy persons of ordinary sensibilities, and of ordinary tastes and habits." *Id*. ("[U]nreasonableness must be determined based on an objective standard of persons of ordinary sensibilities, not on the subjective response of any particular plaintiff.") (cleaned up). "It is not enough that plaintiff himself is offended or annoyed if he is peculiarly sensitive." *Id*. at 600. The inquiry "requires balancing a wide variety of factors, depending on the specific facts." *Id*. at 596.

For negligent nuisance claims, ordinary principles of negligence apply. *Id*. at 607. A plaintiff must establish: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages

9

proximately caused by the breach. *Id*. To establish breach, a plaintiff must show that "the defendant's conduct constituted negligence, which is 'simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done.'" *Id*. (citing *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998)). The plaintiff bears the burden "to prove that the defendant's negligent conduct caused a nuisance, which in turn resulted in the plaintiff's damages." *Id*.

**B. Analysis**

RLS maintains that because the Neighbors did not present evidence of any concrete injury, their claim for negligent nuisance is not ripe. RLS also argues that the Neighbors' articulated injury is breach of restrictive covenant, which sounds only in contract law, and that the Neighbors have not shown how "their allegation of breach of contract can support a negligent nuisance claim in light of the Supreme Court's holdings to the contrary." RLS relies on *Southwestern Bell Telephone*, where the Texas Supreme Court stated, "if the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). The Neighbors respond that they "alleged and evidenced that [RLS] subdivided the 107 acres into 17 lots in violation of the deed restrictions despite being fully aware of them" and that "the genesis" of their negligent nuisance claim "is the fact that [they] now have seventeen neighbors where they should have no more than 2."

"In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss." *Sw. Bell Tel. Co.*, 809 S.W.2d at 494. In doing so, "[t]he measure of damages, standing alone, is not always determinative of whether a tort claim can co-exist with a breach of contract claim." *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999). We have previously distinguished that "[c]ontract obligations arise from a specific

10

agreement between the parties. Tort obligations, in contrast, are those that are imposed by law—apart from and independent of promises made." *Airborne Freight Corp. Inc., v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 293–94 (Tex. App—El Paso 1992, writ denied). The Texas Supreme Court has also clarified that ordinary principles of negligence govern claims of negligent nuisance. *Crosstex*, 505 S.W.3d at 607.

Although Texas has long recognized restrictive covenants as contracts that are subject to general rules of contract construction, we need not decide whether the Neighbors' claim sounds only in contract because in determining the ripeness of the Neighbors' negligent nuisance claim, we do not examine whether RLS owed or breached a duty. *See Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 280 (Tex. 2018) (stating the courts have treated unambiguous restrictive covenants "as valid contracts between individuals"); *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998) ("[R]estrictive covenants are subject to the general rules of contract construction."); *Bruington v. Chesmar Homes, LLC*, No. 08-23-00015-CV, 2023 WL 6972987, at *7 (Tex. App.—El Paso Oct. 20, 2023, no pet.) (mem. op) ("In determining the ripeness of the Bruingtons' negligence claims, we do not consider the question of whether Chesmar Homes owed a duty to the Bruingtons or whether they breached that duty."). Instead, our focus is whether the Neighbors presented jurisdictional evidence showing that RLS caused a substantial and unreasonable interference and that the Neighbors suffered actual damages to render their claim ripe. *See Bruington*, 2023 WL 6972987, at *7. We conclude they did not.

The Neighbors did not show that subdividing the acreage into 17 lots or that having "17 neighbors" caused a substantial and unreasonable interference with their use and enjoyment of their land. Plaintiff's Exhibit 9, the engineering plans submitted to Burnet County for plat approval of the 17 lots, was admitted at trial without objection. Brewer, the engineer who handled the plat process for the 17 lots, testified about the "Schematic Utility Design," which he described as an

"outline" showing only "possible home sites," "potential" septic-system locations, and "potential water well location[s]." Brewer testified that it was merely "a potential" and "possible" for 17 homes, septic systems, and wells to be constructed, and the Schematic Utility Design labeled them as "POTENTIAL" locations. But the evidence at trial showed that at the time, all 17 lots remained completely undeveloped. No structures, wells, or septic systems had been built. There was also no evidence at trial that any of the 17 owners occupied their land. The 17 lots were described at trial as "rural, central Texas pastureland" and the photos admitted at trial reflect that description. No evidence showed that any construction was imminent or certain to occur. If a party cannot show "a reasonable likelihood that the claim will soon ripen," the claim is not ripe and "the case must be dismissed." *Robinson*, 353 S.W.3d at 755 (citing *Perry v. Del Rio*, 66 S.W.3d 239, 251 (Tex. 2001)).

The Cedars confirmed this. Charles testified he could see the undeveloped land from his property, and when asked if it was an annoyance, he responded, "No." Deborah testified that "when they start building houses [] there's going to be, you know, more traffic, more noise, more lights, you know, it's just not going to be the same," underscoring that her concerns were purely speculative. Allen likewise testified that he did know what the future owners would do with their land. He stated that his "expectation is there's going to be 17 houses built over there, and there's going to be drilling things going on, and there's going to be septics put in. And it's not like they're all going to be going on at the same time. They're going to go on for a long time with that number of building going on." When asked whether he would still be able to "live out [his] vision," Allen responded, "I hope so, but no one can tell the future." These contentions are based solely on speculative future possibilities of events that have not occurred, and may or may not even occur, and are insufficient to invoke jurisdiction. *See Gibson*, 22 S.W.3d at 852 (recognizing that a

"ripeness analysis focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated or may not occur at all'").

The only construction performed at the time of trial was a gate for the entrance of Cross Timber Ranch and a road within Cross Timber Ranch—which all had been completed well before trial. When asked about the effects, Allen described stress and mental health issues, and confirmed he could still hunt, fish, keep Longhorn cattle roaming his 60 acres, and watch the sunrise on the east—all concerns he had. Allen's son confirmed that their pond project could still proceed and that nothing about the development prevented them from building the pond. Allen's son also testified that on one occasion, he and his father heard construction equipment and saw dust. This testimony does not rise to level of substantial or unreasonable interference based on an objective standard.

Charles testified that construction of the road produced cedar mulch, dust that covered his roof and vehicles, and noise. But he provided no dates, no duration, no frequency, no evidence of recurrence, and no evidence of physical injury, even though he stated he "actually got hit" by cedar. Though Charles testified the dust covered his vehicles and stained his roof, he admitted that he had not attempted to wash the dust from his roof and acknowledged that he did not know whether his roof was permanently stained. He also admitted that the 17 lots and the construction did not prevent him from hunting, that wildlife still roamed his land, and though his wife had stopped gardening, nothing prevented her from doing so and she "definitely could" still garden. Deborah provided brief testimony and likewise did not identify evidence of a substantial and unreasonable interference. We agree with RLS that the Cedars "presented no evidence of any concrete injury in the past and their concerns about the future are merely conjectural and hypothetical." Where the evidence consists of "mere allegations and speculation," of events that have not yet passed, the claim is not ripe. *Robinson*, 353 S.W.3d at 756 (citing *Perry*, 66 S.W.3d

at 249) (claims based on "uncertain or contingent future events" is not ripe for judicial determination); *Patterson*, 971 S.W.2d at 444 (a potential injury cannot be ripe unless it is established with certain and definite documentation); *Crosstex*, 505 S.W.3d at 600 ("It is not enough that plaintiff himself is offended or annoyed if he is peculiarly sensitive."); *Bruington*, 2023 WL 6972987, at *7–11 (holding nuisance claims were not ripe and dismissing cause due to lack of evidence of a substantial or unreasonable interference, reliance on speculative opinions, and insufficient jurisdictional evidence for damages or injunctive relief)

Accordingly, the Neighbors' claim for negligent nuisance is not ripe for review and the trial court lacked subject matter jurisdiction. Issue Two is sustained. Because our holding is dispositive, we do not reach the remaining complaints of RLS's appeal.

## III. THE NEIGHBORS' CROSS-APPEAL

In their cross-appeal, the Neighbors assert that the trial court erred by granting a directed verdict on their breach of restrictive covenant claim for lack of evidence of any damages.

### A. Standard of review and applicable law

We review the trial court's grant of a directed verdict de novo. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). "In doing so, a directed verdict is reviewed under the same legal-sufficiency standard that applies to no-evidence summary judgments." *Gespa Nicaragua, S.A. v. Recom AG*, 705 S.W.3d 362, 389 (Tex. App.—El Paso 2024, pet denied). The nonmovant bears the burden of identifying evidence raising a genuine issue of material fact as to each challenged element of its cause of action. *Id*. In reviewing a trial court's ruling, we may affirm a directed verdict on any ground that supports it. *Id*.

### B. Analysis

The Neighbors contend that they should be able to recover loss and enjoyment damages on their breach of restrictive covenant claim and that the trial court erred by granting a directed verdict

dismissing that claim. They maintain that they have "searched exhaustively and in vain for any Texas authority on the question of whether loss of enjoyment damages are available in a breach of restrictive covenant case and, if so, under what circumstances." The Neighbors assert that loss of enjoyment damages are recoverable for a breach of restrictive covenant claim, but RLS correctly points out that "no Texas court has recognized loss of enjoyment as a measure of recoverable damages in a breach of restrictive covenant case." Aside from citing a 1972 Alaska case, the Neighbors have not shown—and we are unaware of any—binding precedent permitting such recovery for a breach of a restrictive covenant claim. We therefore cannot conclude that the trial court erred in granting RLS's motion for directed verdict on this ground. We overrule the Neighbors' sole issue.

## IV. CONCLUSION

Having found that the Neighbors' claim for negligent nuisance is not ripe for our review and sustaining RLS's Issue Two, we reverse the trial court's judgment and render judgment dismissing the Neighbors' lawsuit for lack of subject matter jurisdiction.

MARIA SALAS MENDOZA, Chief Justice

April 7, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

15